**UNITED STATES of América, Plaintiff,**

v.

**CITIZENS AND SOUTHERN NATIONAL BANK et al., Defendants.**

Civ. A. No. 15823.

United States District Court,
N. D. Georgia,
Atlanta Division.

Jan. 25, 1974.

As Amended June 3, 1974.

Donald A. Kincaid, Kenneth D. Stern, Curtis L. Frisbie, Attys., Dept. of Justice, Antitrust Div., Atlanta, Ga., for plaintiff.

Charles M. Stapleton and Cubbedge Snow, Martin, Snow, Grant & Napier, Macon, Ga., amicus curiae.

Daniel B. Hodgson, Michael A. Doyle and Walter M. Grant, Alston, Miller & Gaines, Atlanta, Ga., Philip L. Roache, Jr., Washington, D. C., for defendants.

FINDINGS OF FACT

CONCLUSIONS OF LAW
AND ORDER

MOYE, District Judge.

INTRODUCTION

A. *The Proceeding and the Parties*

This action, instituted by the United States of America ("the Government") under Section 15 of the Clayton Act, as amended [15 U.S.C. § 25], seeks injunctive relief to prevent and restrain alleged violations of Section 7 of the Clayton Act, as amended [15 U.S.C. § 18], which would result from the consummation of contemplated mergers within the Atlanta Metropolitan Area which are described below. The Government also alleges violations of Section 1 of the Sherman Act [15 U.S.C. § 1] and seeks injunctive relief under Section 4 of that Act [15 U.S.C. § 4].

The defendants, who oppose the relief sought by the Government, are:

1. The Citizens and Southern National Bank ("C&S National"), formerly the Citizens and Southern Bank, a state bank with headquarters in Savannah, Georgia, itself, a product of the merger of the Citizens Bank of Savannah and the Southern Bank of Georgia in 1906. In 1927 the Citizens and Southern Bank was converted to a national banking association which presently exists under the laws of the United States. C&S National presently has over 60 banking offices in six Georgia cities, about 40 of which are located in Fulton and DeKalb Counties. While the home office of C&S National is located in Savannah, its principal executive, actual headquarters and principal place of business are located in Atlanta, Fulton County, Georgia. C&S National is registered under the laws of the United States as a bank holding company by virtue of its ownership of The Citizens and Southern Holding Company ("C&S Holding," *infra*). As of June 30, 1970, C&S National had total assets of approximately 1.7 billion dollars, total deposits of 1.4 billion dollars, and net loans and discounts of 1.1 billion dollars.

2. C&S Holding, a wholly-owned subsidiary of C&S National, was organized in 1927 and is a registered bank holding company existing under the laws of the state of Georgia having its home office and principal place of business in Atlanta, Georgia. It owns a majority stock interest in several Georgia banks, including three located in the Atlanta area —The Citizens and Southern Emory Bank ("Emory"), The Citizens and Southern Bank of East Point ("East Point"), and The Citizens and Southern DeKalb Bank ("DeKalb"). The latter, DeKalb, is not a defendant, but since it is a part of the overall C&S system of banks in the area involved herein, it is relevant to note that DeKalb presently has two offices, both located in DeKalb County, and as of December 31, 1970, had total assets of 28.4 million dollars, deposits of 23.5 million dollars and total loans and discounts of 22.9 million dollars.

3. Emory, a 95 percent-owned subsidiary of C&S Holding, is a state banking corporation with its headquarters and principal place of business in a residential area of DeKalb County, Georgia, near Emory University. It presently has four offices, all located in DeKalb County. As of December 31, 1970, Emory had total assets of approximately 42.3 million dollars and total loans and discounts of 28.5 million dollars.

4. East Point, a 90 percent-owned subsidiary of C&S Holding, is a state banking corporation with its principal place of business and headquarters in the suburban community of East Point, Fulton County, Georgia. It has four offices, all located in Fulton County. As of December 31, 1970, it had total assets of 28.4 million dollars, total deposits of 23.3 million dollars, and total loans and discounts of 22.9 million dollars.

5. The Citizens and Southern Chamblee Bank ("Chamblee") is a state banking corporation with its principal place

of business and headquarters located in Chamblee in the northern part of DeKalb County, Georgia. It was originally organized in 1960 as a national banking association. In 1969 Chamblee converted into a state-chartered bank and adopted its present name. Chamblee has two offices, both located in DeKalb County. As of December 31, 1970, it had total assets of 21.1 million dollars, total deposits of 18.7 million dollars and total loans and discounts of 10.7 million dollars.

6. The Citizens and Southern Park National Bank ("Park National") is a national banking association located in the Executive Park area of DeKalb County, Georgia. As of December 31, 1970, it had total assets of 11.1 million dollars, total deposits of 9.8 million dollars and total loans and discounts of 3.5 million dollars.

7. The Citizens and Southern South DeKalb Bank ("South DeKalb") is a state banking corporation located in the Candler-Glenwood area of DeKalb County, Georgia. South DeKalb was organized in 1969. At the time of trial it operated one office in DeKalb County and had approval to open an additional office, also in DeKalb County, which was actually opened in November, 1972. As of December 31, 1970, South DeKalb had total assets of 5.1 million dollars, total deposits of 4.3 million dollars and total loans and discounts of 2.1 million dollars.

8. The Citizens and Southern Bank of Tucker ("Tucker") is a state banking corporation having its principal place of business and headquarters at Tucker, DeKalb County, Georgia. Tucker was chartered as the Bank of Tucker in 1919, and existed as such until 1965, when C&S Holding purchased five percent of its stock, and Tucker adopted its present name. Tucker operates two offices, both in DeKalb County. As of December 31, 1970, it had total assets of 26.5 million dollars, total deposits of 23 million dollars, and total loans and discounts of 14.8 million dollars.

9. The Citizens and Southern Bank of North Fulton ("North Fulton") is a state banking corporation and has its only office in Roswell in the northern part of Fulton County, Georgia. It has pending an application for authority to open an additional office to be located in Alpharetta, also in Fulton County, Georgia. As of December 31, 1970, it had total assets of 7.7 million dollars, total deposits of 6.3 million dollars and net loans and discounts of 5.6 million dollars.

10. The Citizens and Southern Bank of Sandy Springs ("Sandy Springs") is a state banking corporation having its only office in Sandy Springs, a suburban community north of Atlanta in Fulton County, Georgia. Sandy Springs was organized as a national banking association in December, 1959, as the Citizens National Bank of Sandy Springs. In October, 1969 Sandy Springs converted to a state chartered bank and adopted its present name. As of December 31, 1970, it had total assets of 22 million dollars, total deposits of 19 million dollars and net loans and discounts of 11.7 million dollars.

All defendant banks concededly are engaged in interstate commerce.

In September 1970, Emory entered into agreements to acquire all the assets and assume all the liabilities of Chamblee, South DeKalb, Park National and Tucker. Concurrently, East Point entered into similar agreements with North Fulton and Sandy Springs. All agreements were approved by the stockholders and directors of the banks involved, and, except for the Emory-Tucker agreement, all were approved by the Federal Deposit Insurance Corporation ("FDIC"), the appropriate federal regulatory agency. Since C&S National owns C&S Holding, and since C&S Holding owns 95 percent of the stock of Emory and East Point, the proposed transactions are, in substance, acquisitions by C&S National and will be so treated by the Court.

Within the time provided by law, the Department of Justice brought this suit pursuant to Section 7 of the Clayton Act to enjoin the five mergers approved by the FDIC and the mergers were automatically stayed. [12 U.S.C. § 1849(b)] The Government also seeks to enjoin, as a violation of Section 1 of the Sherman Act, the operation of Chamblee, Park National, South DeKalb, Tucker, North Fulton and Sandy Springs as part of the overall C&S system, contending that there is a concerted activity of exchanging, on a formal and continuing basis, detailed information as to past, present and future competitive policies and practices which constitutes combinations between and among each of these banks and C&S National. The Court will sometimes refer to these six banks as the "five percent defendants" because C&S Holding owns five percent of the stock of each of those banks—the maximum permitted by Georgia law.

All defendant banks transact business and are located within the Northern District of Georgia which is within the geographical jurisdiction of this Court.

### B. *Background of this Litigation*

#### 1. *History of Banking Laws in Georgia*

The banks involved in this litigation are the subject of concurrent state and federal regulation by multiple regulatory authorities operating under numerous regulatory statutes. Some of the banking laws of Georgia are particularly relevant to consideration of the issues herein.

Prior to 1927, Georgia's branch banking laws contained no limitation on the geographic areas in which banks could open branches. New branches, however, required the approval of the State Superintendent of Banks. In 1927 the establishment of additional branch banks was absolutely prohibited, regardless of location, but in 1929 the laws were again amended to permit banks to open branches in cities in which their "home offices" were located.

Georgia's branch banking laws were further amended in 1965 to permit banks to branch throughout cities in which they might be located, regardless of the location of their "home office," and, since 1971, banks have been permitted to branch throughout the counties in which they are located.

In 1956 the Georgia Bank Holding Company Act was enacted. Under that law, bank holding companies were initially limited to the future acquisition of only 15 percent of the stock of a bank. Since 1960, however, Georgia law has prohibited Georgia bank holding companies from acquiring more than five percent of the stock of a bank.

In Independent Bankers Assn. of Georgia, Inc. v. Dunn et al., 230 Ga. 345, 197 S.E.2d 129 (1973), the Supreme Court construed the five percent law [Georgia Laws 1960, p. 67 ff; Ga.Code Ann. § 13–207(b)] and held that stock owned by shareholders, officers and directors of the bank holding company must be attributed to the holding company for purposes of complying with the five percent limitation. [230 Ga. at 362, 197 S.E.2d 129]

#### 2. *History of the C&S Bank in the Atlanta Area*

C&S National opened its first branch in Atlanta in 1919, at a time when Georgia law contained no limitations as to the geographic areas in which banks could open branches.

When the Georgia banking laws were changed in 1929 so as to permit branching by banks only in cities in which their "home offices" were located, C&S National, with its home office in Savannah, Georgia, was prohibited from further branching in Atlanta although its competitors with home offices in Atlanta were permitted to open branches throughout the city. Thus for the period 1930–1960, thirty-one years, C&S National was confined to the three branches it had opened in Atlanta prior to the 1927 "freeze."

In an effort to avoid the above state restrictions on branch banking, C&S Na-

tional formed C&S Holding in 1927. In 1946 C&S Holding acquired the stock of East Point. In 1950 C&S National and C&S Holding organized Emory to extend C&S banking services to an area of residential and collegiate growth in DeKalb County. And in 1954 C&S Holding acquired the stock of DeKalb, which is located in the unincorporated Avondale Estates community in DeKalb County. Since the creation or acquisition of these banks, C&S National and/or C&S Holding have owned virtually all of their stock.

East Point, Emory, and DeKalb became part of the C&S system at a time when Georgia laws restricted branch banking, but contained no limitations on bank holding company expansion. The enactment of the Georgia Bank Holding Company Act in 1956, and its amendment in 1960 to prohibit acquisition of more than five percent of the stock of a bank, did not affect C&S Holding's ownership of East Point, Emory and DeKalb, but applied only to future acquisitions. After 1971, of course, C&S National could establish, and has established, branches outside the city limits of Atlanta in both Fulton and DeKalb Counties.

Due to the restrictions described above, in 1959 C&S National began its association with what were termed at trial as "Correspondent Associate Banks," usually referred to herein as the "five percent defendants." They are Sandy Springs, North Fulton, Park National, Chamblee and South DeKalb. C&S National's association with each of the above five percent defendant banks commenced at their inception. Whether the organization of these banks was the "brain child" of C&S National, or of local leaders, in each instance is the subject of some dispute between the plaintiff and defendants—but the record is clear that C&S National and/or C&S Holding participated substantially in the creation of each five percent defendant bank. The record also demonstrates that such participation was undertaken because C&S had no other legal opportunity available to it at that time to enter the market areas involved, and that C&S's involvement was prompted by hope that it would be the forerunner of much larger interests in the future. It is also clear that such initial C&S participation effectively precluded *ab initio* any real competition between the C&S system and the five percent defendant banks. For example, the assumption of the bank regulators that C&S National would be responsible for the management of the five percent defendants was instrumental in their chartering of those banks. And it is contrary to experience that a profit-making corporation voluntarily creates competition for itself.

The only "Correspondent Associate Bank" in Fulton and DeKalb Counties which C&S National and/or C&S Holding did not participate in the creation of is C&S Tucker. That bank became a correspondent associate of C&S in 1965 when its owners requested C&S National to provide it management. The FDIC did not approve the proposed merger of Tucker with Emory because it concluded that the 1965 acquisition by C&S Holding of effective control of the then independent Bank of Tucker was anticompetitive. As noted above, however, the FDIC did approve the proposed mergers involving Sandy Springs, Chamblee, Park National, North Fulton and South DeKalb.

Basic to the FDIC's approval of the proposed mergers were the following findings (Gx33B; Gx33C):

"The banks involved in the proposed mergers do not compete today and never have competed in the past.

\* \* \* \* \* \*

"Under these circumstances, the proposed mergers of these . . . 5 percent banks into a majority-owned C&S subsidiary would not eliminate any existing competition between them or between either bank and any other C&S unit. Such mergers would not alter the existing competitive structure . . . in any way or

add to the concentration of banking resources now held by the C&S system.

\* \* \* \* \* \*

"Furthermore, the Corporation finds no reasonable probability that [the 5% banks] would become disassociated from the C&S system in the future if the proposed mergers are denied.

\* \* \* \* \* \*

"If voluntary dissaffiliation represents no more than an unlikely possibility, the Corporation finds itself unable to conclude that the proposed mergers would eliminate any significant potential for increased competition between the [5% banks] or between either of them and the rest of the C&S system banks."

The FDIC concurrently approved one branch application by East Point in Fulton County, and one by Emory in DeKalb County, but denied six of Emory's DeKalb County branch applications because it concluded that "competitive considerations outweigh the limited benefit that might accure to the public from the existence of the additional facilities."

**C.** *The Contentions of the Parties and the Issues Before the Court*

In the discussion which follows the Court will first consider the Sherman Act issues and then the Clayton Act charges relating to the proposed mergers.

As a prelude, the Court notes that Section 7 of the Clayton Act [15 U.S.C. § 18] would prohibit the proposed mergers if their effect would be "substantially to lessen competition, or tend to create a monopoly" (1) "in any line of commerce" (2) "in any section of the country." In this case there is no contention that the proposed acquisitions would "tend to create a monopoly." Nor is there any issue as to what is the ap-

propriate "line of commerce." Prior decisions of the Supreme Court foreclose any determination other than that it is "commercial banking"[1]—a determination with which defendants are in factual and legal disagreement, although they recognize its inevitability. Thus the Section 7 issues are:

1. What is the appropriate "section(s) of the country" to be considered in connection with the proposed mergers?

and

2. Will the proposed merger(s) "substantially lessen competition" in that "section(s) of the country"?

With respect to the Sherman Act allegations, defendants not only deny any combination in restraint of trade but also contend that the relationships among the banks involved are governed by the Bank Holding Company Act, 12 U.S.C. § 1841 et seq., particularly Section 3 thereof, with which defendants say they have fully complied. Additionally, defendants contend that the Federal Reserve Board ("FRB") has primary jurisdiction of the Sherman Act allegations and that the Department of Justice is not a proper party to raise a claim based thereon.

With respect to the Clayton Act charges, defendants proffer the following defenses: that there is no substantial actual competition which will be eliminated by the proposed mergers, that the proposed mergers are in fact procompetitive, that any possible anticompetitive effects flowing therefrom would be outweighed by their probable beneficial effect of meeting the convenience and needs of the community to be served, and that the mergers constitute acquisitions of subsidiary corporations to which Section 7 of the Clayton Act does not apply.

1. United States v. Philadelphia National Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed. 2d 915 (1963), in which the Court held that "the cluster of products (various kinds of credit) and services (such as checking accounts and trust administration) denoted by the term 'commercial banking' . . . composes a distinct line of commerce." [374 U.S. at 356, 83 S.Ct. at 1737]; United States v. Phillipsburg National Bank & Trust Co., 399 U.S. 350, 360–361, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970).

## I.

### ARE THE DEFENDANTS VIOLATING SECTION 1 OF THE SHERMAN ACT?

Section 1 of the Sherman Act proscribes "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . ."

The Government contends that the evidence shows that the five percent defendants engaged in a concerted activity of exchanging detailed information on a formal and continuing basis among themselves and between them and the C&S system. This information is said to relate to past, present and future competitive policies and practices and its exchange is alleged to constitute a combination within the meaning of Section 1 of the Sherman Act.

The defendants do not deny the close operating relationships existing between the five percent defendant banks and the C&S system. The evidence clearly substantiates such relationships and the defendants' defense actually is predicated thereon. The evidence, however, does not similarly support the inference of such relationships between the five percent defendant banks *inter sese*. The defendants contend that C&S National and C&S Holding either caused, or were essential catalytic agents in, the formation of the five percent defendant banks, that management control relationships have continued ever since (since 1965 in the case of Tucker), that such relationships are protected by the "grandfather" provision of the Bank Holding Company Act, that the five percent defendant banks are in effect subsidiaries of C&S, and that, therefore, their formation was excluded from the coverage of the antitrust laws by Section 7 of the Clayton Act, and that, in any event, the question of the violation of Section 1 is committed to the exclusive primary jurisdiction of the Federal Reserve Board.

It is the duty of this Court preliminarily to dispose of challenges to its jurisdiction. As noted above, defendants assert that the Section 1 Sherman Act charges are within the exclusive primary jurisdiction of the FRB. Their position is based primarily on Whitney National Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965), wherein the Supreme Court stated:

> "We believe Congress intended the statutory proceedings before the Board to be the sole means by which questions as to the organization or operation of a new bank by a bank holding company may be tested." [379 U.S. at 419, 85 S.Ct. at 557]

Defendants cite an investigation by the FRB in 1967–1968 of the transactions whereby C&S Holding and C&S National acquired stock in and established continuing operating relationships with "C&S Correspondent Associate" banks. (The five percent defendant banks have been C&S Correspondent Associate banks as to which, according to the testimony of C&S's former Chief Executive Officer, there has always been an intention that they would become 100 percent C&S banks as soon as applicable law permitted.) That investigation culminated in an understanding between the FRB and C&S whereby C&S could purchase five percent of the stock in a bank, furnish management assistance, employee benefits, and a president as well as one or two directors and not be deemed to have control of the directors or stock of the bank involved. [Letter from Tynan Smith to Donald I. Baker, March 15, 1972, Gx 177B, quoted at pp. 15–16, *infra*.] Defendants assert that plaintiff participated in the above investigation, but did not institute any action as a result of said understanding despite the requirement of Section 11(b) of the Bank Holding Company Act that:

> "Any action brought under the antitrust laws arising out of an acquisition, merger, or consolidation transaction shall be commenced within such thirty-day period." [12 U.S.C. § 1849(b)]

Defendants further claim that action by the Department of Justice is foreclosed by Section 9 of the Bank Holding Company Act [12 U.S.C. § 1848] which provides for a review by the Court of Appeals of orders of the FRB, which review was never sought.

Plaintiff agrees with the proposition that the FRB has primary jurisdiction to consider questions concerning the "organization or operation of a new bank by a bank holding company" [Plaintiff's brief filed April 10, 1972, pp. 1–2], but claims that that doctrine has no application to the case at hand, stating:

> "Plaintiff therefore concludes that when a question arises concerning only the organization of a new bank by a bank holding company, the answer must be initially found in the Board, subject to review in a Court of Appeals. Logically, this is the 'original exclusive jurisdiction' referred to by the Supreme Court in *Whitney*. That, however, is not the question involved in this case and the very broad language used in *Whitney*, put in its proper context, cannot support the proposition that the BHCA has ousted the district courts of their jurisdiction over anti-trust violations when the defendant happens to be a bank holding company." [Plaintiff's brief, supra, pp. 6–7]

With respect to the 1967–1968 "investigation" by the FRB, plaintiff submitted on March 22, 1972, a supplement to its previous brief in opposition to defendants' motion to strike and attached thereto a copy of a letter to Mr. Donald I. Baker, Director of Policy Planning of the Antitrust Division of the Department of Justice, from Mr. Tynan Smith, Secretary of the Board of Governors of the Federal Reserve System dated March 15, 1972. Smith's letter, a response to an earlier letter from Mr. Baker, outlined the position of the Board of Governors as to the 1968 "understanding" and asserted in part:

> "There was no determination made that approval of the Board under section 3 of the Bank Holding Company Act was required for Citizens & Southern to retain an ownership interest of 5 percent or less in the banking institutions referred to or to maintain the relationships with those banks in circumstances where Citizens & Southern did not elect a majority of the directors of any such bank. There was an understanding reached between members of the Board's staff and representatives of Citizens & Southern that in those cases where Citizens & Southern purchased 5 percent or less of the stock of a bank, in some instances furnishing a principal operating officer for such bank, as well as other employee benefits, Citizens & Southern would not be deemed to have control of a majority of the directors of such bank on these facts alone. Further, where the foregoing circumstances existed and where control of additional shares was purchased by the bank's executive officer, control of such shares purchased would not be attributed to Citizens & Southern so long as Citizens & Southern did not finance the purchase of such shares, directly or indirectly. Finally, it was understood that even though Citizens & Southern was responsible, directly or indirectly, in placing one or two directors on the boards of such banks, if that number did not constitute a majority of directors of such bank, the Board's staff would not consider that Citizens & Southern could reasonably be held to have control of a majority of the directors of such bank.

> \*      \*      \*      \*      \*      \*

> "A representative of the Department of Justice Antitrust Division was invited to attend the conference in April 1968 inasmuch as the Department is the agency of the Government having primary responsibility for enforcement of Federal laws with particularized responsibilities relating to possible anti-competitive practices and in view of the fact that any willful violation of any provision of the Bank Holding Company Act may be re-

ferred by the Board to the Department of Justice for appropriate investigation and action." [Letter from Tynan Smith to Donald I. Baker, March 15, 1972. Gx 177B]

According to plaintiff, the issues involved in the FRB investigation to which the above excerpts refer were "(1) had C&S Holding acquired more than five percent of the correspondent associates' stock without prior Board approval and (2) had C&S Holding controlled the election of a majority of the correspondent associates' directors without prior board approval." [Plaintiff's brief filed March 22, 1972, p. 2]

The Government in its post-trial brief (p. 64) takes the position that the exchange of information which forms the basis of its Sherman Act charge amounts to a per se violation of Section 1 of that Act. The Court believes a brief analysis of this position will be helpful in determining the exclusive primary jurisdiction issue.

Generally, only unreasonable restraints of trade violate Section 1 of the Sherman Act. Some practices such as agreements not to compete, collusive price fixing, agreements for market division, group boycotts, tie-in agreements (perhaps), and pooling of profits and losses, however, have been found to be so intrinsically unreasonable as to constitute what has come to be called per se restraints or violations of the Act. In commenting on the above, Honorable Lee Loevinger, then Assistant Attorney General in charge of the Antitrust Division, noted:

"It is implicit in this approach to the subject that, whether the legal judgment is based upon intrinsic or extrinsic evidence, it is always intended to be both a pragmatic and a reasonable one. The law proscribes only practices which reasonable men have judged socially incompatible with the maintenance of a free competitive economy. The only difference between the categories of proscribed acts is whether evidence to establish the conclusion that they are unreasonable is inherent in the character of the acts or must be sought in the circumstantial setting. In any case, the rule of reason is implicit in every determination that any conduct is illegal as restraint of trade." [19 A.B.A. Antitrust Section 245, 250]

There is no question that banking is a regulated industry. In its brief of March 17, 1972, the Government notes:

"Financial institutions, including bank holding companies, are subject to a myriad of statutory regulations administered by a diverse collection of regulatory bodies, including both federal and state agencies. See United States v. Philadelphia National Bank, 374 U.S. 321, 327–330, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Thus, a single institution may be regulated by the Board, the Federal Deposit Insurance Corporation, the Comptroller of the Currency and/or any of several state regulatory agencies depending on its activities. The BHCA is simply one of many statutes which affect the operation of banks." [Plaintiff's brief filed March 17, 1972, p. 3]

Furthermore, the defendants' activities complained of by the Government were all part of the operations of the five percent defendant banks at a time when full branching or ownership was not permitted to C&S, and, in this connection the Court notes with interest Part D of the Government's jurisdictional statement on appeal to the Supreme Court in U. S. v. Marine Bancorporation, Inc., et al., 1973–1 Trade Cases ¶ 74,496, review granted, 414 U.S. 907, 94 S.Ct. 228, 38 L.Ed.2d 145 (1973), in which the Government stated:

"D. STATE BANKING LAW AND THE AVAILABLE MEANS OF ENTRY INTO THE SPOKANE MARKET

Washington law permits banks to open branches only in (1) the city in

which their headquarters is located; (2) the unincorporated areas of the county in which their headquarters is located; and (3) incorporated communities which have no banking office. Branching into other areas is permitted by the acquisition of an existing bank or banking office. *Banks in the State of Washington have, however, achieved de novo entry into areas foreclosed to de novo branching by sponsoring the organization of an affiliate bank, and later acquiring the bank. This method of expansion is a legal (Tr. 732–733) and a well-recognized practice used by large statewide banking organizations (GX I, Tr. 280–298) and recognized by the federal banking authorities (GX H).*

"Since NBC's headquarters is in Seattle, it is legally barred from opening a branch in Spokane. In order to enter the city, it would have to make some kind of acquisition. Apart from entry by purchase of a large market share, the method attempted in this case, there were two significant possibilities; acquisition of a sponsored bank formed by its officers, directors or their associates as an independent firm to be assisted by NBC until acquired and converted into a branch; or acquisition of a smaller 'foothold' bank.

"In the last decade, the sponsored bank procedure has become an established method by which national banks enter new markets in Washington. The sponsored bank must first be chartered by the Comptroller as an independent bank. It must be operated for a period of time as a *bona fide* and independent institution, although it may be affiliated with its sponsor for purposes of correspondent relationships and other inter-bank services, including financial support. It may be acquired by its sponsor, with the Comptroller's consent, after it has become established in the banking structure of the community it serves." (Emphasis added)

The Government contends that the following aspects of the relationships between the defendants have restrained interstate trade and commerce:

1. The routine and systematic practice of furnishing to one another comprehensive information as to past, present and future competitive practices and policies with a purpose of achieving uniformity among the defendants;

2. The provision by C&S National to the five percent defendants of various manuals and memoranda;

3. The provision by C&S National to the five percent defendants of suggestions and advice on such matters as rates, hours of operation, types of loan to discourage and minimum loan rates. [Plaintiff's post-trial brief, pp. 57–64]

The Government also asserts, and the record shows, that the advice and suggestions offered by C&S National are generally followed.

These activities, however, do not amount to collusive price fixing. For example, there is no suggestion that any advice as to rates amounts to more than an expert appraisal of a market situation from the point of view of a lending institution—a type of opinion to which a lending institution would naturally be expected to pay great attention. Likewise, the Court does not view the pleadings or evidence as suggesting the existence of any agreements not to compete or for market division. Considering the relatively local nature of the banking area in which each of the five percent defendants operate, there necessarily is a "market division" in a sense established by their very physical location—a matter with which the Court is not here concerned. While the record will show that there has been some transfer of accounts to one or more of the five percent defendants geographically better located to serve an account, such evidence falls far short of any agreed market division or agreement not to compete. The

Court views these apparently isolated instances as analogous to the situation where reservation clerks of one airline inform a potential traveler that another airline offers a more convenient schedule.

The practices involved here do not conform to the accepted definition or description of per se antitrust violations where no resort to context or circumstances is required (or permitted). Thus the following subsidiary questions must be resolved before a violation of Section 1 can be found under the circumstances of this case:

> Is it unreasonable for a five percent defendant bank to implement operating practices similar or identical to those in effect at other C&S banks through the efforts and background knowledge of a principal operating officer furnished by C&S in accordance with the "understanding" with the FRB?

> Perhaps the presence of C&S nominees on the Board of Directors contributed to the same end, but is that not what must have been contemplated? What did the representative of the Justice Department's Antitrust Division participating in the conference, out of which the understanding arose, assume would be the function of such nominees?

> If the FDIC can approve, as it has, 100 percent ownership and operation of the five percent defendant banks as pro-competitive, can it be said that the lesser degree of control now exercised is per se anticompetitive?

The same type of questions can be posed as to each of the factors relied upon by the Government in support of its claims of per se illegality. [see Plaintiff's post-trial brief, pp. 57–64] It would be the Court's obligation to determine the reasonableness of each of the challenged practices in the overall context of the banking situation in the area involved unless the doctrine of exclusive primary jurisdiction is applicable to oust this Court's jurisdiction of the Section 1 charges.

*Whitney, supra,* is authority that such doctrine is applicable not only to questions of organization, but also to questions of operation of banks by bank holding companies. The *Whitney* opinion certainly appears broad enough to cover the factual situation here presented. All of the five percent defendant banks, except Tucker, were new banks when the practices complained of were initially instituted. Certainly, in an industry as minutely, exclusively and as duplicatively regulated as the banking industry, there will be an infinite number of accommodations to the requirements of the different regulations, to the economics of the entire industry, to geographical aberrations, and to similar matters that point to the need for expert judgment as to whether a certain practice is or is not reasonable. The Department of Justice's acquiescence in 1968 in an understanding involving the more substantial elements of what it now claims to be Section 1 violations is indicative, to at least a small degree, that such practices were not so violently anticompetitive as to constitute per se violations. Inaction by the Department of Justice with such knowledge would have been a violation of its public duty —and the Court does not impute such negligent inaction to it.

■ In sum, the Court believes, and holds, that the exclusive primary jurisdiction principle set forth in *Whitney* is applicable here even though its implementation may require resort not only to the FRB, but also, perhaps, to other regulatory agencies.

■ Alternatively, having found that the matters complained of are subject to the "rule of reason," the Court finds that, if it has jurisdiction of this matter (in whole or in part—*i. e.,* C&S Tucker) as the Government contends [Plaintiff's brief filed April 10, 1972], the Government has not sustained its burden of proof as to the unreasonableness of the

practices involved or with respect to any adverse impact upon competition. There was no evidence that any customers or potential customers were being adversely affected, and the heads of each competitor organization testified that the operation of the five percent defendant banks as 100 percent C&S banks would not adversely affect them or change the competitive impact on them in any way. There is no evidence that the quality of service would have been improved absent the factors of which the Government complains. The Government has relied upon a claimed per se illegality rather than unreasonableness of the specific practices involved and, for the reasons set forth above, the Court does not believe the evidence will support a finding that such practices in fact were unreasonable restraints of trade. Indeed, the Court is constrained to find that, balancing the evidence, such practices were in fact reasonable.

Thus, the Government, in setting forth the alternatives available if the Court should issue an injunction, has pointed to the ability of other small banks to secure correspondent services from banks as far away as Birmingham. Evidence of these alternative sources of service indicates that such assistance to, or sponsorship of, a smaller bank, is desirable and necessary and not anticompetitive. The difference between a pure correspondent relationship and a correspondent associate relationship as set forth in the evidence is merely one of degree, a fine line of demarcation almost impossible for the Court to perceive. [Plaintiff's post-trial brief, p. 9] The Government refers to a correspondent relationship as a "mutually beneficial arrangement whereby the smaller bank receives needed services and the larger bank obtains both the benefit of the correspondent bank balance kept with it and the income from the sale of its services to the smaller bank's customers." [Plaintiff's post-trial brief, p. 42] According to the Government, the only difference between the services provided the five percent defendant banks and the

services provided ordinary correspondent banks is that such services are provided to the former "routinely and systematically" [Plaintiff's post-trial brief, p. 42], a difference which the Court finds hard to conceive of providing the basis for Section 1 Sherman Act charges. There is no evidence of record to conclude that the utilization by the five percent defendant banks of the services or information received by them from C&S National or C&S Holding was a result of any tacit or explicit combinations rather than the natural deference of the recipient to information from one with greater expertise or better sources. In either case there is the flow of information as to rates, practices, etc., which the Government apparently applauds or at least condones in a correspondent banking relationship. Taking this into consideration, as well as the Government's previously-quoted statement in *Marine Bancorporation, supra,* the Court finds as a fact that the relationship between C&S National, C&S Holding, and the five percent defendant banks, and the interchange of information between them, have been reasonable under the circumstances and not in violation of Section 1 of the Sherman Act. The Court also finds that the Government has not sustained its burden of proof to the contrary.

Therefore, the Court will dismiss the Government's charges based on Section 1 of the Sherman Act because they are (1) subject to the primary exclusive jurisdiction of the FRB, and (2) not supported by the evidence. The Court makes its findings on the merits in the interest of judicial economy, having noted the Government's contention that the exclusive primary jurisdiction doctrine is not applicable.

## II.

### WILL THE PROPOSED MERGERS VIOLATE SECTION 7 OF THE CLAYTON ACT?

Section 7 of the Clayton Act prohibits acquisitions such as are here involved

"where in any line of commerce in any section of the country the effect of such acquisition may be substantially to lessen competition. . . ."

As noted above, the appropriate "line of commerce" has been determined to be "commercial banking."

A. *What is the appropriate "section of the country" against which the proposed mergers are to be tested?*

The Government contends that the appropriate "section(s) of the country" are the relevant geographic markets of DeKalb County, North Fulton County, Fulton County and the Atlanta area. [Plaintiff's post-trial brief, p. 6] Defendants contend that the appropriate "section of the country" is the "localized suburban banking market" surrounding each bank sought to be acquired by C&S. [Defendants' post-trial brief, p. 9] The Court need not reach this issue, however, because the Court's disposition of the case is based upon factors which make a precise delineation of the market area unnecessary. When considering the question of diminution of competition, however, the Court will, for purposes of discussion, look to sections of the country which the Government contends are relevant.

B. *Will any of the proposed acquisitions substantially lessen competition?*

*DeKalb County*

Treating C&S National, C&S Emory and C&S DeKalb as one banking organization, there are 19 commercial banking organizations operating offices in DeKalb County. In terms of total deposits and total individual, partnership and corporation ("IPC") demand deposits held by all banking offices located in DeKalb County, the top 4 banks, respectively, are C&S (offices of C&S National in DeKalb County, C&S Emory and C&S DeKalb), First National Bank of

Atlanta, Trust Company of Georgia, and Fulton National Bank. In terms of outstanding loans, the top 4 banks are C&S (offices of C&S National in DeKalb County, C&S Emory and C&S DeKalb), Trust Company of Georgia, Tucker and Fulton National Bank. The shares of total deposits, total loans and total IPC demand deposits accounted for by the four largest banks are as follows:

| Banks | Total Deposits (12/31/71) | Total Loans (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| Top 2 | 38.3% | 42.7% | 34.8% |
| Top 3 | 51.8% | 52.4% | 47.3% |
| Top 4 | 62.9% | 61.8% | 58.2% |

C&S (offices of C&S National in DeKalb County, C&S Emory and C&S DeKalb) accounts for the following shares of total deposits, total loans and total IPC demand deposits held by all banking offices located in DeKalb County.

| Bank | Total Deposits (12/31/71) | Total Loans (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| C&S | 24.1% | 28.5% | 20.1% |

Chamblee, Park National and South DeKalb, all of whose banking offices are located in DeKalb County, account for the following shares of total deposits, total loans and total IPC demand deposits held by all banking offices located in DeKalb County:

| Banks | Total Deposits (12/31/71) | Total Loans (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| Chamblee | 5.7% | 5.7% | 5.9% |
| Park National | 2.9% | 1.5% | 3.0% |
| South DeKalb | 1.8% | 2.5% | 1.9% |
| | 10.4% | 9.7% | 10.8% |

Depending on the unit of measurement, Chamblee is the third or fourth largest bank headquartered in DeKalb County.

If the proposed mergers were approved, the C&S system (which would

include offices of C&S National and South DeKalb) would account for 34.5% of the total deposits of all the banking offices located in DeKalb County, 38.2% of the total loans and 30.9% of the total IPC demand deposits. C&S would also be acquiring the third (or fourth) largest bank headquartered in DeKalb County.

If the proposed mergers were approved, the four largest banks would account for the following shares of the DeKalb County market:

| Banks | Deposits | Total Loans | IPC Demand Deposits |
|---|---|---|---|
| Top 2 after mergers | 48.7% | 52.4% | 45.6% |
| Top 3 after mergers | 62.2% | 62.1% | 58.1% |
| Top 4 after mergers | 73.3% | 71.5% | 69.0% |

Thus, if the proposed mergers were approved, the C&S system's share of total deposits, for example, would increase from about 24% to 34%, or an increase of about 40%. The share of total deposits accounted for by the top 4 banks would increase from about 63% to 73, while that of the top 2 and top 3 banks would increase from 38% to 49% and from 52% to 62%, respectively.

*North Fulton County*

There are nine commercial banks operating offices in North Fulton County. In terms of total deposits and total IPC demand deposits held by all banking offices located in North Fulton County, the top 4 banks, respectively, are Sandy Springs, Roswell Bank, Fulton Exchange Bank and North Fulton. On June 30, 1970, however, there were only five banks operating offices in North Fulton County: the four banks just mentioned and Trust Company of Georgia Bank of Sandy Springs, which is now a branch of Trust Company of Georgia. The shares of total deposits and IPC demand

2. These computations consider the five percent defendant banks as completely separate entities (rather than as constituting a part of the C&S system as actually is the case),

deposits accounted for by the four largest banks are as follows:

| Banks | IPC Demand Deposits (6/30/72) | IPC Demand Deposits (6/30/70) | Total Deposits (6/30/70) |
|---|---|---|---|
| Top 2 | 57.8% | 66.4% | 64.0% |
| Top 3 | 70.1% | 78.9% | 80.2% |
| Top 4 | 80.3% | 90.7% | 91.9% |

As of June 30, 1972, the North Springs Office of C&S East Point accounted for 1.7% of total IPC demand deposits held by all banking offices located in North Fulton County.

As of June 30, 1972, Sandy Springs and North Fulton accounted for 36.4% and 10.2%, respectively, of total IPC demand deposits held by all banking offices located in North Fulton County. As of June 30, 1970, they accounted for 34.4% and 11.7%, respectively, of total deposits held by all commercial banking offices located in North Fulton County.

If the proposed mergers were approved, the C&S system (which would include C&S East Point's North Springs Office, North Fulton and Sandy Springs) would account for 48.3% of the total IPC demand deposits held by all commercial banking offices located in North Fulton County and the four largest banks would account for the following shares of IPC demand deposits in North Fulton County:

| Banks | IPC Demand Deposits |
|---|---|
| Top 2 after mergers | 69.7% |
| Top 3 after mergers | 82.0% |
| Top 4 after mergers | 92.0% |

Thus, if the proposed mergers were approved, the C&S system's[2] share of total IPC demand deposits held by all banking offices located in North Fulton County would increase from 1.7% to 48.-3%, and the C&S system's share in this

and of course, do not relate to competition as such but rather to the assignment of statistical proportions to the various entities involved.

area would be twice that of the second largest banking organization, the Roswell Bank. Two of the four largest banks in the area would become part of the Atlanta area's largest banking organization. In addition, the share of total IPC demand deposits accounted for by the top 4 banks would increase from 80.3% to 92.0%, while the shares of the top 2 and top 3 banks would increase from 57.8% to 69.7% and from 70.1% to 82.0%, respectively.

### Fulton County

Treating C&S National and C&S East Point as one banking organization, there are 18 commercial banking organizations operating offices in Fulton County. In terms of total loans, deposits and IPC demand deposits held by all banking offices located in Fulton County, the top 4 banks, respectively, are C&S (offices of C&S National in Fulton County and C&S East Point), First National Bank of Atlanta, Trust Company of Georgia and Fulton National Bank. The shares of total loans, deposits and IPC demand deposits accounted for by the four largest banks are as follows:[3]

| Banks | Total Loans (12/31/71) | Total Deposits (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| Top 2 | 63.0% | 55.2% | 61.3% |
| Top 3 | 78.8% | 73.9% | 78.1% |
| Top 4 | 89.4% | 87.0% | 88.8% |

C&S (offices of C&S National in Fulton County and C&S East Point) accounts for the following shares of total loans, deposits and IPC demand deposits held by all banking offices located in Fulton County:

| Bank | Total Loans (12/31/71) | Total Deposits (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| C&S | 37.2% | 30.8% | 32.1% |

Sandy Springs and North Fulton, both of whose banking offices are located in Fulton County, account for the following shares of total loans, deposits and IPC

demand deposits held by all banking offices located in Fulton County:

| Banks | Total Loans (12/31/71) | Total Deposits (12/31/71) | IPC Demand Deposits (6/30/72) |
|---|---|---|---|
| Sandy Springs | .7% | .8% | .9% |
| North Fulton | .3% | .3% | .3% |
|  | 1.0% | 1.1% | 1.2% |

Depending on the unit of measurement, Sandy Springs is the eighth or ninth largest banking organization in Fulton County.

If the proposed mergers were approved, the C&S system (which would include offices of C&S National in Fulton County, C&S East Point, Sandy Springs and North Fulton) would account for 38.2% of the total loans held by all banking offices in Fulton County, 31.9% of the total deposits and 33.3% of the total IPC demand deposits.

If the proposed mergers were approved, the four largest banks would account for the following shares in Fulton County:

| Banks | Total Loans | Total Deposits | IPC Demand Deposits |
|---|---|---|---|
| Top 2 after mergers | 64.0% | 56.3% | 62.5% |
| Top 3 after mergers | 79.8% | 75.0% | 79.3% |
| Top 4 after mergers | 90.4% | 88.1% | 90.0% |

### Atlanta Area

Treating C&S National, C&S Emory, C&S DeKalb and C&S East Point as one banking organization, there are 31 commercial banking organizations operating offices in the Atlanta area, six of which operate offices in both Fulton and DeKalb Counties. In terms of total loans, deposits, and IPC demand deposits held by all banking offices located in the Atlanta area, the top 4 banks, respectively, are C&S (offices of C&S National, C&S East Point, C&S Emory and C&S DeKalb), First National Bank of Atlanta, Trust Company of Georgia and Fulton

3. See footnote 2, *supra*.

National Bank. The shares of total loans, deposits and IPC demand deposits accounted for by the four largest banks are as follows:

| Banks | Total Loans (12/31/71) | Total Deposits (12/31/71) | IPC Demand Deposits (6/30/72) |
|-------|------------------------|---------------------------|-------------------------------|
| Top 2 | 60.5% | 53.2% | 58.0% |
| Top 3 | 76.2% | 71.3% | 74.3% |
| Top 4 | 86.7% | 84.2% | 85.0% |

C&S (offices of C&S National, C&S Emory, C&S East Point and C&S De-Kalb) accounts for the following shares of total loans, deposits and IPC demand deposits held by all banking offices located in the Atlanta area:

| Bank | Total Loans (12/31/71) | Total Deposits (12/31/71) | IPC Demand Deposits (6/30/72) |
|------|------------------------|---------------------------|-------------------------------|
| C&S | 36.4% | 30.0% | 30.6% |

Chamblee, Park National, South De-Kalb, Sandy Springs and North Fulton account for the following shares of total loans deposits and IPC demand deposits held by all banking offices located in the Atlanta area:

| Banks | Total Loans (12/31/71) | Total Deposits (12/31/71) | IPC Demand Deposits (6/30/72) |
|-------|------------------------|---------------------------|-------------------------------|
| Chamblee | .5% | .6% | .8% |
| Park National | .1% | .3% | .4% |
| South DeKalb | .2% | .2% | .3% |
| Sandy Springs | .6% | .7% | .8% |
| North Fulton | .3% | .2% | .2% |
| | 1.7% | 2.0% | 2.5% |

If their deposits (as of 12/31/71) were combined ($71,142,252), these five banks would be the equivalent of the sixth largest banking organization in the Atlanta area. Sandy Springs and Chamblee are, alone, the tenth and eleventh largest banking organizations in the Atlanta area, respectively.

If the proposed mergers were approved, the C&S system (which would include the offices of C&S National in the Atlanta area, C&S Emory, C&S DeKalb, C&S East Point, Chamblee, Park National, South DeKalb, Sandy Springs and North Fulton) would account for 38.2% of the total loans held by all banking offices located in the Atlanta area, 32.0% of the total deposits and 33.0% of the total IPC demand deposits. C&S would also be acquiring the tenth and eleventh largest banks in the Atlanta area.

If the proposed mergers were approved, the four largest banks would account for the following shares in the Atlanta area:

| Banks | Total Loans | Total Deposits | IPC Demand Deposits |
|-------|-------------|----------------|---------------------|
| Top 2 after mergers | 62.2% | 55.2% | 60.5% |
| Top 3 after mergers | 77.9% | 73.3% | 76.8% |
| Top 4 after mergers | 88.4% | 86.2% | 87.5% |

From June 30, 1970, to June 30, 1972, 56 branch banking offices were opened throughout Fulton and DeKalb Counties. The major Atlanta banks, C&S, First National Bank of Atlanta, National Bank of Georgia, Trust Company of Georgia and Fulton National Bank accounted for 42 of these offices (18 in Fulton County and 24 in DeKalb County). The remaining offices were established by banks headquartered in the suburban portions of the Atlanta area. Thus the 1971 amendments to the Georgia branch banking laws have already resulted in the opening of 29 offices in the suburban portions of the Atlanta area by the large Atlanta banks.

Since January 1, 1970, C&S has submitted 12 applications for approval of banking offices in the Atlanta area to the Comptroller of the Currency. Of this number, four applications were denied, six were approved but have not yet been opened, and two are still pending. The two pending applications and three of the six approved applications are for locations in the suburban portions of the Atlanta area. Since January 1, 1971, C&S, Emory, DeKalb and East Point have opened a total of eight banking offices in the Atlanta area, five in its suburban portions.

Since January 1, 1971, the following suburban Atlanta banks have established new offices in the Atlanta area: Bank of the South, Citizens Bank of Georgia, DeKalb County Bank, DeKalb Exchange Bank, Fulton Exchange Bank, First Palmetto Bank, Peachtree Bank and Trust Company, Peoples Bank and Roswell Bank. South DeKalb has opened an additional office; North Fulton has filed an application for an additional branch which is still pending, and Sandy Springs was contemplating branching before the proposed mergers were agreed upon.

The Atlanta area is growing rapidly. Much of this growth is occurring in DeKalb County and North Fulton County and is expected to continue.

## C. The Nature of the Relationships Between the Defendants

Defendants argue that, as a result of the past and present relationships between the defendants, the banks involved in the mergers here under consideration do not compete today, have never competed in the past, and that there is no reasonable probability that they will ever compete. [Defendants' post-trial brief, p. 17] The Court will examine the factual basis of that argument.

C&S and C&S Holding were intimately involved in all aspects of the organization of the five percent defendant banks which are the subject of these proposed mergers. The influence of C&S and C&S Holding was significant.

Mr. Mills Lane, who was then president of C&S, and other officers of C&S played a major role in the selection of directors for each of the five percent defendant banks. The directors of each five percent defendant bank were assured of C&S support and have relied upon it. Furthermore, C&S and its officers helped distribute the stock for each five percent defendant bank.

There are a large number of shareholders in each C&S five percent defendant bank, and no single shareholder owns a significant number of the shares of any such bank. C&S Holding, of course, directly owns five percent of the stock of each five percent defendant bank and substantial additional amounts of the stock of each such bank are owned by C&S officers and employees and officers and employees of other C&S banks and their business associates.

Approximately 50 percent of the stockholders of Park National are directors, officers or employees of C&S, Park National, or some other C&S-affiliated bank. An additional 38 percent of the stockholders of Park National are customers of C&S or one of its affiliated banks.

Approximately 44 percent of the stockholders of North Fulton are officers, directors, or employees of C&S or some C&S-affiliated bank or correspondent associate bank. An additional 50 percent of the stockholders of North Fulton are customers of C&S or one of its affiliates.

Approximately 46 percent of the stockholders of South DeKalb are officers, directors or employees of C&S or one of its affiliates. An additional 18 percent of such stockholders are officers, directors or employees of a C&S correspondent associate bank. In total, approximately 66 percent of South DeKalb's stockholders are present or former officers, directors or employees of a C&S bank.

Approximately 24 percent of the stockholders of Sandy Springs are present or former officers, directors or employees of C&S or one of its affiliate banks. An additional 28 percent of the stockholders of Sandy Springs are officers, directors or employees of a C&S correspondent associate bank. In addition, 48 percent of the stockholders of Sandy Springs are C&S customers.

Approximately 12 percent of Chamblee's stockholders are officers, directors or employees of C&S or one of its affiliate banks. An additional 16 percent are officers, directors and employees of a C&S correspondent associate bank. About 29 percent of Chamblee's stockholders are customers of C&S or one of

its affiliate banks, and 41 percent are customers of a C&S correspondent associate bank.

The percentage of stock in each correspondent associate defendant bank held by the above categories of persons has not varied greatly from the time of organization until the time of trial; and there is no claim of violation of the 1968 "understanding" with the FRB.

As noted above, however, subsequent to the trial herein, the Georgia Supreme Court issued its decision in Independent Bankers Assn. of Georgia, Inc. v. Dunn, et al., *supra*, in which it held that the ownership of shareholders, officers and directors of the bank holding company must be attributed to it in complying with the five percent ownership limitation imposed by Georgia law.

According to an uncontroverted supplemental affidavit of Mr. Joseph A. Hall, III, dated August 1, 1973, the percentage of stock in each of the defendant correspondent associate banks owned by C&S Holding and the officers and directors of C&S, C&S Holding, and C&S affiliate banks and their wives, as of the time of the affidavit was as follows:

| | |
|---|---|
| Sandy Springs | 11.75% |
| Chamblee | 6.41% |
| North Fulton | 13.26% |
| Park National | 10.33% |
| South DeKalb | 36.87% |

It would appear that the Georgia Supreme Court's decision in Independent Bankers Assn. of Georgia, Inc. v. Dunn, et al., *supra*, will affect the following percentages of stock (the above percentages less 5 percent) in the five percent defendant banks:

| | |
|---|---|
| Sandy Springs | 6.72% |
| Chamblee | 1.41% |
| North Fulton | 8.26% |
| Park National | 5.33% |
| South DeKalb | 31.87% |

In view of the fact that the decisions of the Supreme Court of Georgia in *Independent Bankers* were issued following the trial in this Court, the Court is left to speculate in large part as to the effect of the Georgia Supreme Court's opinion on the relations *inter sese* of the defendants herein insofar as they are predicated on stock ownership or control.

A survey taken in May 1971 showed that the overwhelming majority of the shareholders in each five percent defendant bank expressly anticipated that C&S would provide management for their bank and that their bank would be merged into C&S or one of its affiliate banks if and when Georgia's branch banking laws were changed to permit such mergers. Many of the directors of the five percent defendant banks assumed that such mergers would eventually be possible because the branch banking laws would be amended or the city limits of Atlanta would be expanded so as to bring into the city some of the areas where such banks are located. Similarly, the executive officers of C&S anticipated that C&S or one or more of its affiliates would merge with the five percent defendant banks as soon as possible.

C&S has made one of its own officers available to be hired as president for each five percent defendant bank and, in each case, the person supplied by C&S has had prior training and experience within the C&S system. With few exceptions each of the officers and employees for each five percent defendant bank had been previously employed or trained by C&S.

With respect to each of the five percent defendant banks, the bank regulators (state and federal) knew that such defendant would be affiliated with a large bank, presumably the C&S system, and such knowledge was instrumental in their decisions to approve the charters of those banks. The affidavit of Mr. William B. Camp, Comptroller of the Currency, states:

"Each of the three defendant banks mentioned above—C&S Sandy Springs, C&S Chamblee, and C&S Park National—were originally chartered as national banks. The charter was issued by the Office of the Comptroller of the Currency after a careful

examination of, among other things, the identity of those persons applying for the charter; their business and banking experience and associations; the proposed management for the banks; the likelihood of financial success of the proposed banks; and the proposed bank's ability to serve the convenience and needs of the community in which it was to be located. In each instance, the Comptroller of the Currency in considering the application was aware of, and took account of, the fact that the proposed new bank, its directors and management would be closely associated with The Citizens and Southern National Bank ("C&S National"). This fact represented a substantial favorable element in considering each ⌐of the applications. The participation of C&S National with the new bank and the availability of C&S National management to act as executive officers of the new bank was deemed to be significant and to some extent controlling in establishing that the bank would be financially successful and could serve all of the banking needs of the potential customers. The relationships between C&S and these banks, and the contributions by C&S in the form of advice and service relationships, was instrumental in the decision for approval of the original charters for these banks by the Office of the Comptroller of the Currency.

Mr. Camp's affidavit went further:

"While C&S Sandy Springs and C&S Chamblee operated under a national bank charter (1959–1969 and 1960–1969, respectively) and during C&S Park National's entire history, the Office of the Comptroller of the Currency had occasion regularly to consider the relationship between these banks and C&S National. Among other such occasions were the periodic examinations of the banks by national bank examiners. The Office of the Comptroller of the Currency was thus fully aware of the existence of the relationships between these banks and C&S National, including the various operating relationships more fully spelled out in the applications submitted on behalf of The Citizens and Southern Bank of East Point and The Citizens and Southern Emory Bank to the Federal Deposit Insurance Corporation respecting the proposed mergers of those banks with certain of the defendants named above. The Comptroller of the Currency considered then that existence of such relationships were in accordance with all applicable laws, and at no time objected to the existence of such relationships. While the Comptroller of the Currency at all times required of these banks, their management and their directors that all necessary operational and fiduciary responsibilities required by law in connection with the existence of these banks as separately chartered banks be adhered to, the Comptroller of the Currency understood that one of the purposes for establishing these banks was to make available to the management of these banks C&S expertise in certain portions of the Atlanta metropolitan area where C&S, by reason of Georgia branch banking laws, could not establish its own operations." [Defendants' Exhibit 152]

State Superintendent of Banks, Mr. W. M. Jackson, whose office approved the charters for North Fulton and South DeKalb, testified that his office was aware of, and found favorable to approval, the fact that C&S would provide the management for those banks and that they would be closely affiliated with the C&S system.

C&S selected, or helped select, the physical location of each five percent defendant bank. In some instances, C&S Holding purchased and held the land for the new five percent defendant bank, and sometimes this was done before the directors of such bank were even selected. C&S's market research department prepared the application for charters and made the required economic survey for each five percent defendant bank.

C&S obtained the necessary insurance coverage for each new five percent defendant bank; it assisted in selecting and procuring equipment and forms for each new bank; it supervised the promotional activities at the time each new bank was organized; and it is safe to say that, from the very beginning, the relationship between C&S and each five percent defendant bank has been much closer than the normal correspondent banking relationship. These factors have an important bearing on the nature, quality and quantity of competition, if any, between the five percent defendant banks and C&S National because, concededly, large banks do not usually furnish presidents or other managing officers from their own staffs to new banks, and large banks are not usually or normally involved in the distribution of stock for new banks or in the selection of their directors.

There are additional factors relevant to this issue. Park National has used the C&S name and logo at all times since it was organized, as have North Fulton and South DeKalb. Sandy Springs adopted the C&S name and logo in 1966 so that it would become more closely identified with the C&S system. Currently there are no visible differences between C&S's branches and the five percent defendant banks in that all of them use the C&S logo and have "Citizens and Southern" in their names. In fact, there is a conscious effort made by all parties to insure that the five percent defendant banks are identified publicly as C&S banks.

A few specific examples are illustrative.

A few years ago, Sandy Springs developed serious liquidity problems because of heavy loan losses. C&S recommended that its then president, Mr. Cook,[4] be replaced and Mr. Cook subsequently resigned. Mr. Louis J. Fortuna, who had spent 16 years as an employee and offi-

cer of C&S, was then elected the new president of Sandy Springs. When Mr. Cook resigned, the directors of Sandy Springs assumed that the new president would be someone who had been previously employed by C&S, and, despite the serious problem resulting during the tenure of the former president who also had been supplied by C&S, they never considered terminating the relationship between Sandy Springs and C&S or looking elsewhere for a president.

Likewise, when Mr. Harris retired as president of Chamblee, he was replaced by Mr. Bobby G. Morris, who previously had been employed by C&S.

The same emergency personnel "pool" that is available to C&S's branches is available to, and used by, the five percent defendant banks when vacancies are caused by sickness, vacations, resignations, or other emergencies. (The five percent defendant banks, however, must pay for each person utilized from this emergency personnel pool.)

The management and staff of all C&S banks, including the five percent defendant banks, are covered by the same employment, salary administration, and fringe benefit programs. It should be noted, however, that the five percent defendant banks are responsible for their own employment programs, administer their own salary programs and have adopted fringe benefit programs which, while similar to those of C&S, are funded by the individual banks. Officers and employees of the five percent defendant banks participate in pension and profit sharing plans which, while funded by the individual banks, are administered by C&S. If an individual is transferred from C&S to a five percent bank, his length of service at C&S is recognized for purposes of the pension and profit sharing plans. Two presidents of five percent defendant banks acknowledged that their benefits and opportunities for advancement relate to their

---

4. Mr. Thomas E. Cook was the first president of Sandy Springs. Prior to becoming such, he had been employed by C&S National for 12 years and had never worked for another bank.

service within the C&S system, rather than with an individual five percent bank, and that they identify their future and associate their careers with the C&S system.

The accounting policies of the five percent defendant banks are the same as those of C&S and its branches and affiliates, and the actual accounting work, is done by the same people at the same place.

The credit administration and controls for the five percent defendant banks are the same as those for C&S and its branches. The officers of each five percent defendant bank attend regular credit meetings with officers of C&S and its affiliates. Certain loans made by the five percent defendant banks are reviewed (at the weekly credit meeting) for credit worthiness by C&S.

The routine credit audits performed by C&S on the five percent defendant banks are vitally important to the continued safety and stability of these banks. Small independent banks frequently develop serious problems because they lack such service and supervision. (However, it should be noted, of course, that C&S National is not the only possible source of such service and supervision.)

The officers and employees of the five percent defendant banks receive and use all of the guides and manuals distributed to and used by C&S banks and branches, including the C&S General Operating Guide, the C&S Installment Loan Audit Manual, the Personnel Policy Manual, the Commercial Loan Audit Manual and the C&S Consumer Credit Operating Guide. Also available to the five percent defendant banks are C&S's helicopter and ground transportation services; any new sales tool, product, or service developed by C&S is automatically provided to the five percent defendants.

An executive officer from C&S generally meets with the Board of Directors of each five percent defendant bank. He is referred to as the "advisory director" and his purpose is to provide needed information about C&S banking to the directors of the five percent defendant bank, and those directors depend on him for such advice.

C&S assists the five percent defendant banks when they have capital problems. When Sandy Springs developed the liquidity problem referred to above, that bank's capital was increased by the purchase by C&S from Sandy Springs of a $100,000 capital note. C&S again provided needed capital to Sandy Springs in 1968 when it purchased a $125,000 convertible debenture. C&S provided additional capital for Chamblee by purchasing a $300,000 convertible debenture in 1968. It likewise purchased a $200,000 capital note from North Fulton.

The five percent defendant banks have been supervised by C&S's branch supervision department since that department was organized in the early 1960's. Through its branch supervision department, C&S regularly reviews the goals, objectives and performance of each five percent defendant bank, following the same procedures that it follows with its branches. Thus it reviews the comparative performance of all banking offices, of the five percent defendants, as well as all others in the C&S system.

All banking services provided by C&S are made available to the customers of the five percent defendant banks. The customers of the five percent defendant banks can handle their banking transactions, such as cashing checks and making deposits, at all the offices of C&S National and its affiliates as well as at the offices of other C&S correspondent associate banks. Similarly, customers of C&S can handle their banking transactions at the offices of the five percent defendant banks. This multiple use of C&S banking facilities is made possible by the joint public identification of the facilities and their identical internal procedures.[5] Many persons who are cus-

---

5. Defendants estimate more than three-fourths of their customers make such multiple use of their facilities.

tomers of either a C&S system bank or a five percent defendant bank make use of the other's banking facilities, at least on occasion. Some of the check cashing and deposit transactions of the five percent defendant banks involve C&S customers who have their accounts at other C&S banks.

Mr. W. M. Jackson, identified above, testified that he routinely contacted executive officers of C&S National whenever bank examinations revealed the need for adjustments in the C&S five percent banks. Mr. Jackson testified that he felt he achieved better results by approaching C&S Holding than by approaching the presidents of the correspondent associate banks, and the Court notes that the adjustments were always made by C&S Holding. He testified also that he realized that the five percent bank would have the same policies, arrangements and support as other C&S banks. Both Mr. Jackson, and Mr. Dunn, the new superintendent of banks, testified that the public views the five percent defendant banks as C&S banks, and that testimony is well supported in the record, which includes similar testimony from officials of other banks in the Atlanta Metropolitan Area.

Despite the differences in the percentage of stock of the five percent defendant banks owned by C&S Holding and the officers and directors of C&S, C&S Holding, and C&S affiliate banks and their wives [see p. 36], it is clear to the Court that all of the defendant banks have the same strong affiliation with the C&S system, and the Court is unable to perceive any difference in degree thereof. This factor, among others, leads the Court to conclude that stock ownership is not the most important cement, nor is even necessary to the maintenance of these strong relationships which appear to be due to other more intangible matters described above.

■ While the persuasive weight of the testimony does not always, or necessarily even usually, coincide with the greater number of witnesses who testify on any subject, it is nevertheless a matter of interest and relevance that no witness (for either the Government or the defendants) testified that the proposed mergers would have any adverse economic or competitive implications whatever (the Government's expert witness did not testify on this point, but merely on what are the relevant sections of the country so far as this litigation is concerned). When questioned as to whether the five percent defendant banks are regarded as part of the C&S system or as independent entities, every banker who testified (including officials of banks which compete with the five percent defendant banks) expressed the view that the proposed mergers would have no effect whatsoever on competition as it relates to third parties.[6] The Court concurs.

D. *Conclusions of Law as to Section 7 Issues*

Section 7 of the Clayton Act [15 U.S.C. § 18] provides in part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

The Bank Merger Act of 1966 [12 U.S.C. § 1828(c)] provides in part:

"(5) The responsible agency shall not approve—

(A) any proposed merger transaction which would result in a

---

6. As the Supreme Court made clear in Brown Shoe Co. v. U. S., 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1961), Congress, in redrafting § 7, was specifically concerned with the "protection of *competition*, not *competitors*." [370 U.S. at 320, 82 S.Ct. 1502] Thus the fact that such competition is provided, if it is, by a branch of C&S National, rather than by an independent corporation is immaterial.

monopoly, or which would be in furtherance of any combination or conspiracy to monopolize or to attempt to monopolize the business of banking in any part of the United States, or

(B) any other proposed merger transaction whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served.

\*    \*    \*    \*    \*    \*

"(7)  (A) Any action brought under the antitrust laws arising out of a merger transaction shall be commenced prior to the earliest time under paragraph (6) at which a merger transaction approved under paragraph (5) might be consummated. The commencement of such an action shall stay the effectiveness of the agency's approval unless the court shall otherwise specifically order. In any such action, the court shall review de novo the issues presented.

(B) In any judicial proceeding attacking a merger transaction approved under paragraph (5) on the ground that the merger transaction alone and of itself constituted a violation of any antitrust laws other than section 2 of Title 15, the standards applied by the court shall be identical with those that the banking agencies are directed to apply under paragraph (5)."

■  Bank mergers are subject to the competitive standards of Section 7 of the Clayton Act. U. S. v. First City

National Bank of Houston, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967). In a bank merger case, this Court must make a *de novo* review of the transaction to determine whether it has anticompetitive effects and, if so, whether the merger's benefits to the community outweigh its anticompetitive disadvantages. U. S. v. Third National Bank in Nashville, 390 U.S. 171, 88 S.Ct. 882, 19 L.Ed.2d 1015 (1968). The burden of proving the reasonable probability of a substantial lessening of competition is upon the Government as plaintiff, U. S. v. Philadelphia National Bank, 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). The defending banks have the burden as to the "convenience and needs" defense allowed under the Bank Merger Act. U. S. v. First City National Bank of Houston, *supra,* 386 U.S. at 366, 87 S.Ct. 1088; U. S. v. Connecticut National Bank, 362 F.Supp. 240, 279 (D.Conn.1973).

With respect to the degree of proof required to make out a Section 7 case, the Supreme Court stated in *Brown Shoe:*

".  .  . Congress used the word '*may be* substantially to lessen competition' (emphasis supplied), to indicate that its concern was with probabilities, not certainties. Statutes existed for dealing with clear-cut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable anticompetitive effect were to be proscribed by this Act.  .  .  ." [370 U.S. at 323, 82 S.Ct. at 1522]

See also United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 607, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); United States v. I. T. & T. Corp., 324 F. Supp. 19, 30–31 (D.Conn.1970); United States v. Connecticut Nat'l Bank, 362 F. Supp. 240 (D.Conn.1973).

■  It being conceded that "commercial banking" is the appropriate "line of commerce", and the Court having adopted (for purposes of discussion) the Government's delineation of the relevant

"section of the country" to be considered, the determinative issue is whether the effect of the proposed mergers "may be substantially to lessen competition." As noted previously, it is the mergers' effect upon competition that is important —not the corporate identity of the participants or competitors. The Court has found that there would be no diminution of competition between the five percent defendants *inter sese,* whether they are considered as separate corporate entities or as branch components of the C&S system, or between such five percent defendants and third parties, if the acquisitions sought were approved. The other side of the coin, of course, is the effect of the acquisitions upon competition between the five percent defendants and the C&S system of banks.

In this connection, an important judicial precedent to be considered is the opinion of the United States District Court for the Western District of Texas, El Paso Division, in United States v. Trans Texas Bancorporation, Inc., (W. D.Tex.1972); 1972 Trade Cases ¶ 74,257; Civil No. EP–72–CA–83 (W.D. Tex., filed Nov. 13, 1972); affirmed, 412 U.S. 946, 93 S.Ct. 3014, 37 L.Ed.2d 996 (1973), which is almost squarely in point.

In *Trans Texas,* the district court did not find the mergers or acquisitions to be anticompetitive and therefore refused to enjoin them. It is also noteworthy that the mergers in *Trans Texas* had received, as have the proposed mergers here, the approval of the appropriate federal banking regulators. The background of that litigation is set out in the report of the Board of Governors of the Federal Reserve System approving the Texas applications, which was quoted and considered by the District Court:

> "Majority shareholders of El Paso Bank organized First Bank in 1948, Northgate Bank in 1959 and Border Bank in 1971. El Paso Bank is a full service bank serving the entire El Paso area, whereas the other three serve primarily their own particular suburban area. All four banks are in

the same market area and absent the common ownership would be competitors to some extent despite the disparities in their size.

> "The United States Department of Justice advised the Board that in its opinion consummation of the proposal would have a significantly adverse effect on competition. Its advise was based on its views that the subject banks were in actual competition and that there was some degree of impermanence in the control relationship.

> "On the basis of the record, the Board concludes that there is no significant existing competition between the banks involved. This is due to the fact that two individuals and their business associates control a majority of the voting shares of El Paso Bank, 86% of the shares of the First Bank, 86% of the shares of Northgate Bank, and 75% of the shares of Border Bank. The two individuals themselves control over 25% of the voting shares of each of the three smaller banks.

> "In view of the close relationship between the banks over a long period of time, and the lack of any evidence on the record that dissipation of the common control is likely in the future, the Board concludes that present and potential competition would neither be foreclosed by approval of the application nor encouraged by its denial. Neither does it appear that competition with and between other banks in the area would be affected in any significant way.

> "Considerations relating to the financial and managerial resources and future prospects of Applicant and the banks concerned are satisfactory and consistent with approval. Since the institutions involved are presently under common control it is unlikely that consummation of the proposal will have a significant effect on the banking convenience and needs of the communities to be served, although Applicant does propose to expand the services offered by the smaller banks. These considerations are consistent

with but provide little weight toward approval of the applications. It is the Board's judgment that consummation of the proposed transaction would be in the public interest, and that the application should be approved.

"On the basis of the record, the application is approved for the reasons summarized above." [1972 Trade Cases ¶ 74,257 at p. 93,208]

The defendants in *Trans Texas* contended, as do defendants herein, that the proposed acquisitions were without effective competitive significance as the three banks to be acquired were "common ownership" affiliates of El Paso and that the effect of the acquisition would be merely to change the form of banking organization from its present structure to that of a group banking organization. In *Trans Texas* the Department of Justice took a position similar to that espoused in this case and contended that the banks involved were in actual competition with each other and that there was a degree of impermanency in the control relationship. In *Trans Texas* some of the problem also stemmed from the anti-branching statutes of the State of Texas. After considering the legalities of the existing control relationships (which will be considered below in the instant case) and in the absence of evidence that the common control would be likely to be dissipated in the future, the *Trans Texas* court held that there was no significant existing competition between the banks involved and therefore that the proposed transaction, if consummated, would have no significant adverse competitive effect on the banking community. Accordingly, the *Trans Texas* court denied injunctive relief.

The *Trans Texas* court recognized that the principal issue to be decided was the question of control, and stated that "If control does exist the Court is of the opinion that the three neighborhood banks lacked competitive capabilities and there was no actual competition among them." [1972 Trade Cases ¶ 74,257 at p. 93,213]

The Supreme Court's summary affirmance of the district court's decision in *Trans Texas* is a decision on the merits and must be followed by this Court. Although the Supreme Court has noted that, "As frequently occurs in the case of summary affirmance, the decision . . . is somewhat opaque," [7] it seems to this Court that with respect to the *Trans Texas* case, the Supreme Court had to determine that the district court's finding of lack of competition between merging entities was sufficient to preclude application of the Clayton Act despite the fact that in *Trans Texas*, as in this case, the banks were separate entities and the lack of competition resulted from a control situation—in *Trans Texas* a third party legal stock control situation—here, a similar situation but one based on numerous implementing relationships in addition to stock ownership.

Fundamental to the decision of the District Court in *Trans Texas* was the underlying finding of the FRB that ". . . there is no significant existing competition between the banks involved." The reason for that lack of competition was explained in the Board's findings as ". . . due to the fact that two individuals and their business associates control a majority of the voting shares . . ." of those banks. The FRB also found, as pointed out specifically by the District Court, that "All four banks are in the same market area and absent the common ownership would be competitors to some extent despite the disparities in their size." The District Court also determined that, by reason of their common control by two individuals and their business associates, there was no actual existing competition between the banks involved.

The evidence as to the existing competition between the five percent defendant banks and C&S National and other banks in the C&S system is marshaled

---

7. Gibson v. Berryhill, 411 U.S. 564, 576, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973).

at pp. 22–35 of the Government's post-trial brief. There is, of course, some such competition. It was variously denominated as "friendly" or "minor" competition. It might well be denominated "rivalry" rather than "competition." But, considering the geographic dispersal or separation which exists between the five percent defendant banks, as well as between those banks and other constituents of the C&S system of banks, this is to be expected.

The Government admits that it did not challenge the initial acquisition by C&S Holding of its five percent interest in each of the five percent defendant banks because those acquisitions "were competitively insignificant when made." [Plaintiff's post-trial brief, p. 14] The Government has not carried its burden of demonstrating any substantial increase in the degree of control or change in quantity of competition between the date of the initial acquisitions and the date of the trial. The Government has postulated that if the mergers are denied, C&S may establish *de novo* branches in direct competition with the five percent defendants. To find a viable competitive result from such a postulate, the Court would have to speculate that (1) the five percent defendant banks actually would break away from C&S, (2) they would become successful independent banks despite their past reliance on C&S, and (3) the regulatory agencies would approve directly competitive branching by C&S. The evidence of record does not support, individually or collectively, such postulates or speculations. Furthermore, it seems to the Court that the relevant issue is not what the banks would do if the mergers were denied by this Court, but rather what they would do in the absence of any ruling by the Court, or perhaps in the absence of litigation, although the dividing line between these two statements of the appropriate issue is quite fine. In any event, it is the Court's finding that the relationship as among the defendants is principally a matter of such intangible factors as the intentions of the principals, and that stock ownership is merely one manifestation along with various implementing operating procedures. Thus stock divestiture, if required, would not necessarily or probably eliminate the relationships which negative competition among the defendants, and the evidence of record would not permit a finding that even complete divestiture would result in any substantial increase in competition among them.

■ Thus, the Court finds as a fact that there is no presently existing substantial competition between the five percent defendant banks and C&S National, or *inter sese*, or with third parties, which would be affected by the proposed merger. So far as the issues in this antitrust case are concerned, the Court is of the opinion that it makes no difference whether this absence of competition results from a legally effective stock ownership control, as in *Trans Texas*, or from the more intangible factors present here. It is the absence of competition which is the crucial factor in a Section 7 case, not the underlying factors producing that situation.

■ Amicus curiae, Independent Bankers Association of Georgia, Inc., urges the Court to find for the Government on the ground "that if this Court permits these five banks to be merged into the Citizens & Southern Emory Bank and the Citizens & Southern Bank of East Point, it will forever preclude the Georgia Commissioner of Banking and Finance from carrying out the judgment of the Supreme Court of Georgia" in Citizens & Southern National Bank v. Independent Bankers Association of America, 231 Ga. 421, 202 S.E.2d 78 (1973), Opinion on Reconsideration and Rehearing, decided November 15, 1973. The jurisdiction and function of this Court, however, relates to the enforcement of the antitrust laws of the United States—not the banking laws of the State of Georgia. The Georgia courts are perfectly competent for the latter. Thus, the defendants' disregard of Georgia's banking laws is

only relevant to the issue of whether the effect of the proposed mergers "may be substantially to lessen competition." The Court has already found that substantial competition does not presently exist among the defendants. Possible past violations of Georgia's banking laws cannot change that factual finding. The Court notes that the Supreme Court of Georgia does not appear to consider such violations as may have existed as being more than technical—that is, as negativing the good faith of those involved. [231 Ga. p. 425, 202 S.E.2d p. 81 (1973), Opinion on Reconsideration.] To be relevant such violation must involve the issue of potential competition or potentially increased competition. Thus, in *Trans Texas* the district court excluded a situation where there might be "evidence in the record that dissipation of the common control is likely in the future." [1972 Trade Cases ¶ 74,257 at p. 93,215] It is clear to the Court that there will be some dissipation of the common stock ownership of the defendant banks due to the Georgia Supreme Court's opinion in *Independent Bankers*. As has been indicated above, however, there is no evidence to show that the five percent defendants have exerted, or since the *Independent Bankers* decision, are exerting, any "threshold" competitive influence [*i. e.*, U. S. v. Penn Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); U. S. v. El Paso Natural Gas, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964)] whatsoever vis-a-vis the C&S system. Furthermore, there has been no showing that substantial competition would arise among the defendants if the common ownership is dissipated to the full extent required by the Supreme Court of Georgia.

Although the Government argues that there have been successful partings of the way in the past as between downtown Atlanta banks and their suburban affiliates, the Court finds the evidence does not show that the markets involved

can continue to support, *ad infinitum,* new independent banks in place of affiliated banks. The Government concedes the beneficial effect of the advice and assistance which the downtown banks and others provide the smaller correspondent banks. The record supports the smaller banks' need for such services. There is no evidence of the possibility or feasibility of any arrangement as among the suburban banks, with or without the downtown banks, which would provide the required services in a more competitive manner. The Court is left to speculation and conjecture on this point. Therefore, following the lead of the district court in *Trans Texas* [1972 Trade Cases ¶ 74,257 at p. 93,210], this Court will consider the findings of the FDIC with respect to the mergers in this case. Weighing the findings of the FDIC (considered by this Court as in the nature of expert testimony only) with the Court's own judgment of the underlying evidence herein, the Court finds that the proposed mergers will not substantially lessen competition, but, in fact, will be pro-competitive, and therefore the Court finds for defendants and against plaintiffs.[8]

In view of the above disposition of the Section 7 issues, the Court does not reach defendants' so-called "subsidiary" defense. Similarly, there is no need to consider the defendants' contention that any anticompetitive effects of the proposed mergers are outweighed in the public interest by the probable effect of the mergers in meeting the convenience and needs of the communities to be served.

Let judgment enter in favor of defendants.

The statutory stay in effect against the effectuation of the proposed mergers shall expire upon the Government's failure to appeal from this order within the time permitted by law. Otherwise, the proposed mergers shall not be effectuated until the completion of any appeal taken by the Government.

8. The Court has now considered the final order entered by E. D. Dunn, Commissioner of the Georgia Department of Banking and Finance on May 22, 1974, pursuant to the *Independent Bankers* decision. That order does not change the underlying basis of the Court's decision that the proposed mergers will not substantially lessen competition.