**INDEPENDENT BANKERS ASSOCIA-TION OF GEORGIA, Petitioner,**

**v.**

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent,**

**Citizens and Southern Holding Company, Intervenor.**

**No. 73–2025.**

United States Court of Appeals, District of Columbia Circuit.

Argued 6 Nov. 1974.

Decided 31 July 1975.

1208

Arthur B. Hanson, Washington, D. C., with whom John N. Fenrich, Jr., Washington, D. C., was on the brief, for petitioner.

Donald Etra, Atty., Dept. of Justice, with whom Carla A. Hills, Asst. Atty. Gen., and Robert E. Kopp, Atty., Dept. of Justice, were on the brief for respondent. Jean A. Staudt, Atty., Dept. of

Justice, also entered an appearance for respondent.

Daniel B. Hodgson, Atlanta, Ga., with whom John H. Brebbia, Washington, D. C., John K. Train, III, Atlanta, Ga., and Michael A. Greenspan, Washington, D. C., were on the brief, for intervenor. H. C. Kilpatrick, Washington, D. C., also entered an appearance for intervenor.

Before ROBINSON, ROBB and WILKEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

This appeal comes from an order of the Board of Governors of the Federal Reserve System (Board), dated 31 August 1973, approving the proposal of the Citizens and Southern Holding Company (C & S Holding) to engage *de novo* through a newly formed subsidiary, Citizens and Southern Mortgage Company (C & S Mortgage) in the activities of mortgage banking. In challenging that order, petitioner Independent Bankers Association of Georgia (Association) raises the following issues:

(1) Whether the Association was denied its statutory right under section 4(c)(8) of the Bank Holding Company Act (Act)[1] to an evidentiary hearing before the Board.

(2) Whether the finding of the Board that the public benefits of the C & S proposal would outweigh the possible adverse effects is supported by substantial evidence.

(3) Whether the C & S proposal would constitute branch banking in violation of federal and Georgia law.

We do not reach the latter two issues, because we hold that the Association was denied its statutory right to an adjudicatory hearing in which to explore those very questions.[2] We reverse the order of the Board, and remand for such a hearing.

## I. Facts and Procedural Setting

C & S Holding is a wholly-owned subsidiary of Citizens and Southern National Bank (C & S National), both of which are registered bank holding companies within the meaning of the Bank Holding Company Act. C & S National is the largest bank in Georgia; C & S Holding owns more than fifty percent of the stock of eight banks and five percent of the stock of 27 other banks in Georgia. Including these indirectly-held affiliates as under effective C & S control,[3] C & S National controls twenty-three percent of the bank deposits in Georgia.[4]

The C & S Holding proposal at issue involves the formation of C & S Mortgage as a wholly-owned subsidiary of C & S Holding, with a transfer of the bulk of C & S National's real estate lending activity to C & S Mortgage.[5] C & S Mortgage would engage in the activities of a mortgage company—including making and servicing loans and acting as an investment or financial advisor—in eleven Georgia communities. Under Board

---

1. 12 U.S.C. § 1841 et seq. (1970). The Bank Holding Company Act prohibits bank holding companies from owning or controlling the voting shares of any company which is not a bank, except for certain exemptions set forth in the Act. 12 U.S.C. § 1843. One of these exemptions is contained in section 4(c)(8), which permits a bank holding company to acquire the shares of any company whose activities are "so closely related to banking . . . as to be a proper incident thereto." 12 U.S.C. § 1843(c)(8). The Board has been delegated the responsibility of administering this provision of the Act. In deciding whether particular activities are a "proper incident" to banking the Board is required to determine in a given case whether their performance by the

proposed affiliate of a bank holding company "can reasonably be expected to produce benefits to the public .. . . that outweigh possible adverse effects . . . ." *Ibid.*

2. A fourth issue raised by the Association involves the legality under the National Bank Act, 12 U.S.C. § 21 et seq. (1970), of the corporate structure of C & S National. We find no necessity for a factual hearing on this question and agree with the Board's conclusion that the Association's position is without legal merit. See note 8 *infra.*

3. See note 84 *infra.*

4. R. 384 ("R." refers to portions of the original record filed in this court.)

5. R. 49–50.

regulations governing the administration of section 4(c)(8) of the Act, a bank holding company may engage *de novo* in the type of activity proposed by C & S Holding without Board approval, unless adverse comments to the proposal are received by the local Federal Reserve Bank (Bank) within thirty days after publication of the proposal.[6]

C & S Holding advised the Bank on 24 January 1972 that it had published notice of its proposal in newspapers of general circulation in the eleven communities. In January and February the Bank received protest letters both from the Association and from individual banks and savings and loan associations objecting to the proposal on the grounds that it would not produce benefits to the public and would be in violation of Georgia branch banking laws. On 8 March 1972 the Bank requested C & S Holding to submit comments and views on the issues raised; at the same time the protestants were informed they could supplement their earlier letters of comment if they wished. C & S Holding responded in April with a memorandum of law and additional information about its proposed operation. The opponents of the proposal furnished no supplemental material.

On 1 June 1972 the Bank approved the C & S Holding proposal, whereupon several protestants petitioned the Board for review. The Board granted the petition, supplied each party with a copy of the C & S Holding memorandum previously submitted to the Bank and invited the parties to submit legal memoranda or other documents. The memoranda subsequently submitted to the Board by the protestants detailed their legal position on the branch banking issue, argued that approval of the C & S Holding proposal would lessen competition by further contributing to the dominant financial position of the C & S system, and instanced two communities (Rome and Athens, Georgia) where no public benefit would accrue from the proposal.

On 9 August 1972 the Association, joined by the First National Bank of Athens, filed a Petition for Hearing, requesting the Board to order a formal hearing in accordance with the Board's regulations, including pre-hearing discovery procedures.[7] The hearing was requested for the purpose of enabling the parties to develop the facts regarding the parties' allegations of, *inter alia,* unfair competition, undue concentration of resources, and unlawful branch banking. On 27 February 1973 the pleas were renewed in an Amended Petition for Hearing, accompanied by a memorandum which raised one new argument, *viz.,* that the C & S Holding proposal should be denied because C & S National's corporate structure was illegal.[8]

6. 12 C.F.R. § 225.4(b)(1).

7. 12 C.F.R. § 263.

8. C & S National created C & S Holding in 1928. From 1928 to 1965 all of the stock of C & S Holding was held by C & S National as trustee for C & S National's stockholders. In 1965, C & S National, after receiving the approval of its shareholders, the Comptroller of the Currency, and the Federal Reserve Board, transferred all of the shares of C & S Holding to C & S National. The Association argues that this transfer constituted a violation of the proscription of 12 U.S.C. § 24 against the "purchase" by a national bank "for its own account of any shares of stock of any corporation." Association Br. at 43–46.

When approval for the transfer was originally sought in 1965, the Board considered the transaction's conformity not only with 12 U.S.C. § 24 but also with pertinent provisions of the Bank Holding Company Act. As to the latter, the Board concluded:

[V]iewed realistically, consummation of the described proposal by Citizens Bank would not involve an acquisition of ownership or control of the kind that Congress intended to forbid under section 4(a) [12 U.S.C. § 1843(a)], and for similar reasons the transaction would not result in acquisition of ownership or control of bank stock that would require the Board's approval under section 3(a)(2) [12 U.S.C. § 1842(a)(2)] of the Act.

CCH Federal Banking Law Reporter 1965, ¶ 94,326. As to 12 U.S.C. § 24, the Board found:

Since the ownership of the stock involved would be transferred without consideration, there appears to be no "purchase" as that term is used in R.S. 5136 [codified as 12

On 26 June 1973, almost ten months after the Association's original request, the Board denied the petition for hearing, stating:

In denying this request, the Board has determined that the objections on which the request for hearing was predicated raised questions as to the legal effect of or conclusions to be drawn from certain facts, but did not raise any dispute as to relevant material facts.[9]

Subsequently, by order of 31 August 1973, the Board approved the C & S Holding proposal. On 11 September 1973 C & S Holding advised the Board that C & S Mortgage had commenced operations in seven Georgia cities. The Association filed its petition for review of the Board's order in this court on 28 September 1973.

Responding to the first issue raised by petitioner, the Board makes three arguments in support of its position that the Association was not entitled to a formal evidentiary hearing under section 4(c)(8) prior to the Board's approval of the C & S Holding proposal: (1) there is no statutory right to an adjudicatory hearing under section 4(c)(8); (2) even assuming such a right exists, the Association's request raised no material issues of fact which warranted a hearing; and (3) the Association forfeited any right it may have had to a hearing by waiting until 9 August 1972 to initiate its request. We deal with these three arguments in turn below. We conclude this opinion by noting the prematurity of reviewing the other issues raised in this case, since they are properly the subject of the adjudicatory hearing to which we hold the Association is entitled.

## II. The Right to a Hearing Under Subsection 4(c)(8) of the Bank Holding Company Act

The Bank Holding Company Act, originally enacted in 1956, was based on the belief that

bank holding companies ought not to manage or control nonbanking assets having no close relationship to banking.[10]

Thus, section 4 of the Act provided that after May 1956 no bank holding company could acquire ownership or control of any company which is not a bank.[11] Under subsection 4(c)(8),[12] however, this prohibition did not apply to acquisitions of

shares of any company all the activities of which are or are to be of a financial, fiduciary, or insurance nature and which the Board *after due notice and hearing, and on the basis of the record made at such hearing, by order* has determined to be so closely related to the business of banking as to be a proper incident thereto and as to make it unnecessary for the prohibitions of this section to apply in order to carry out the purposes of this chapter.[13]

There was no question that the Board could only make decisions under this sub-

---

U.S.C. § 24]. Accordingly, the prohibition of that section would not be applicable.

In the opinion of the Board, therefore, neither the statutes cited nor any other provisions of Federal banking laws present any impediment to consummation of the Citizen Bank's proposal. *Ibid.*

In view of the fact that the 1965 transaction involved only a merging of beneficial interest with legal interest in stock already held by C & S National—coupled with the fact that the transaction involved no consideration—the Board's conclusion as to the legality of the "acquisition" appears sound. Moreover, as there are no facts about the transfer in dispute, and none which the Association claims it might uncover in adversary proceedings, a hearing on this issue is not required. See text accompanying notes 55–57 *infra*. The question is entirely legal in character, and we agree with the Board's interpretation of the law.

**9.** R. 389.

**10.** S.Rep.No.1095, 84th Cong., 1st Sess. 1 (1956).

**11.** 12 U.S.C. § 1843 (1970).

**12.** That section was section 4(c)(6) in 1956; it was renumbered as section 4(c)(8) in 1966.

**13.** 12 U.S.C. § 1843(c)(6) (1956) (emphasis added).

section by order, on a case-by-case basis, after a full adjudicatory hearing.[14]

In 1970 the Act was extensively revised. As amended, section 4(c)(8) now allows bank holding companies to acquire

shares of any company the activities of which the Board *after due notice and opportunity for hearing has determined (by order or regulation)* to be so closely related to banking or managing or controlling banks as to be a proper incident thereto. In determining whether a particular activity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices. In orders or regulations under this subsection, the Board may differentiate between activities commenced *de novo* and activities commenced by the acquisition, in whole or in part, of a going concern.[15]

The central issue presented here is the extent to which the 1970 amendments to section 4(c)(8) have affected the right of interested parties to obtain a full adjudicatory hearing in which to challenge the application of a bank holding company to engage in "closely related" activity.

The Board, represented by the Civil Division of the Department of Justice,[16] argues that the 1970 amendments effectively abolished the requirement in all cases that it hold full evidentiary hearings under section 4(c)(8). As support for its view, the Board points to the insertion of the words "*opportunity for hearing*" and "(by order *or regulation*),"

and the deletion of the language requiring Board determinations to be made "on the record." According to the Board, "The plain implication of this statutory change is that the Board in section 4(c)(8) cases need simply afford the opportunity for an informal hearing, typical of rule-making proceedings."[17] Since the Association received notice of the Board's consideration of C & S's application and was afforded an opportunity to submit its comments, the Board concludes the Association received the minimal procedural protection to which it was entitled under the statute.

We are persuaded, however, by (1) the legislative history of the 1970 amendments, (2) the appropriate procedures suggested by the statutory scheme as a whole, and the Administrative Procedure Act, and (3) the questionable importance of the exclusion from the statute of the "on the record" clause that the Board's conclusion is erroneous.

### A. *Legislative History—the "Opportunity for Hearing" Clause*

Hearings on amendments to the Bank Holding Company Act of 1956 were first held during April and May 1969 before the House Committee on Banking and Currency. The only testimony relating to the hearing requirement of section 4(c)(8) came from William McChesney Martin, Jr., then Chairman of the Board of Governors of the Federal Reserve System. He stated:

Bank holding company acquisition of companies engaged in most of these activities is now permissible to some extent, under section 4(c)(8) or under other paragraphs of section 4(c). But section 4(c)(8) requires that a formal hearing be held before a hearing examiner on each application thereunder, even in the absence of any interest or testimony by anyone other than the applicant. This is a time-consuming and expensive procedure, *which should*

---

14. See text accompanying note 18 *infra.*

15. 12 U.S.C. § 1843(c)(8) (1970) (emphasis added).

16. See text accompanying note 81 *infra.*

17. Govt. Br. at 30.

*be limited to instances where a hearing is requested by an interested party.*[18]

An identical statement was later made by Mr. Martin's successor, Chairman Burns, in similar hearings before the Senate Committee.[19] Both the House and Senate passed amendments to section 4(c)(8) which included the insertion of "opportunity for hearing." As had the House Report,[20] the Senate Report explained:

> The bill also eliminates the formal requirement that a hearing be held on each application under the section, even in the absence of any interest or testimony by anyone other than the applicant. The bill instead provides that there be "notice and opportunity for hearing", *thereby limiting the hearing procedure to cases where parties other than the applicant are interested.*[21]

The Conference Report reiterated:

> The third change in Section 4(c)(8), replacing the language "due notice and hearing" with "due notice and *opportunity* [original emphasis] for hearing", was made at the recommendation of the Federal Reserve Board so that the Board would not be required to hold hearings in all cases involving Section 4(c)(8) applications, *but should hold hearings in all cases where a contest is raised.*[22]

The legislative history of the "opportunity for hearing" amendment thus makes one point crystal clear: in no way was it intended to deprive an interested party of his right to obtain a full adjudicatory hearing in which to challenge a section 4(c)(8) application. Indeed, the Conference Report admonishes that the Board "should hold [such] hearings in all cases where a contest is raised."[23] In the face of this clear expression of Congressional intent, it is impossible to accept the Government's argument that the addition of the words *"opportunity for hearing"* to the statute has somehow deprived the term "hearing" of its adjudicatory characteristics. If anything, the necessity for formal proceedings, when properly requested and supported by an allegation of material facts in dispute, has been reaffirmed. (Part III, *infra*, discusses in detail the general requirement, common to all requests for an adjudicatory hearing before an administrative agency, that the petitioner raise a dispute as to material facts.)

B. *The Nature of the Statutory Scheme—the "By Order or Regulation" Clause*

■ Prior to 1970, the Board could act under section 4(c)(8) only by order, after a full adjudicatory hearing. The 1970 amendments to that section empowered the Board to act "by order or regulation." The Board argues that this language gives the Board the option to employ rulemaking procedures—as opposed to adjudicatory procedures—to adjudge all holding company applications under section 4(c)(8). This conclusion is supported neither by the legislative history of the provision nor by the statutory scheme of which the provision is a part.

■ As the Conference Report explains:

> The inclusion of the term "(by order or regulation)" was made to indicate that the Board could act under Section 4(c)(8) either by order *in specific cases*

---

18. Hearings on H.R. 6778 Before the House Comm. on Banking and Currency, 91st Cong., 1st Sess., pt. 1, at 199 (1969) (emphasis added).

19. Hearings on Bills to Amend the Bank Holding Company Act of 1956 Before the Sen. Comm. on Banking and Currency, 91st Cong., 2d Sess. 143 (1970).

20. H.R.Rep.No.387, 91st Cong., 1st Sess. 16 (1969).

21. S.Rep.No.1084, 91st Cong., 2d Sess. 15 (1970), U.S.Code Cong. & Admin.News, 1970, pp. 5519, 5534 (emphasis added).

22. H.R.Rep.No.1747, 91st Cong., 2d Sess. 15 (1970), 1970 U.S.Code Cong. & Admin.News, pp. 5561, 5566 (emphasis added).

23. *Ibid.*

or by regulation *in a general classification or category of cases* in order to provide maximum flexibility as a procedural matter in administering this section.[24]

It appears clear from the language of the Report that Congress was simply making it statutorily possible for the Board to make determinations of general applicability by regulation. In short, the statute now recognizes the time-honored distinction between rulemaking and adjudication.[25] As a general matter, agencies employ rulemaking procedures to resolve broad policy questions affecting many parties and turning on issues of "legislative fact." Adjudicatory hearing procedures are used in individual cases where the outcome is dependent on the resolution of particular "adjudicative facts."[26]

■ The Board has utilized its newly recognized rulemaking authority under section 4(c)(8) to promulgate a series of regulations—denominated as a group, "Regulation Y"[27]—listing activities which the Board has determined generally to be "closely related" to banking. (Among these are the mortgage company activities in which C & S proposes to engage.)[28] It would appear that the Board stood on solid statutory ground when it elected to issue these guidelines by regulation rather than proceed on a case-by-case basis.[29]

■ That a particular holding company application complies with the "closely related" requirement of section 4(c)(8), however, by no means automatically qualifies it for Board approval. The application must still pass the "public benefits" test contained in the second sentence of that subsection:

> The effect of section 4(c)(8) as a whole is to establish, in effect, *two tests* for the Federal Reserve Board to use in deciding cases under section 4(c)(8). First, the Board must determine whether the particular activity sought to be engaged in is "so closely related to banking or managing or controlling banks as to be a proper incident thereto." And, *secondly*, in determining whether a particular activity is "a proper incident" to banking . . ., the Board must determine *whether the public benefits outweigh the adverse effects*, such as the ones enumerated in the second sentence of section 4(c)(8). . . . [T]he Board may find in a particular case that it cannot approve a proposed activity for a specific bank holding company because it fails to meet the second test even

---

**24.** *Ibid.*

**25.** Not only has Congress built the procedural provisions of the Administrative Procedure Act, 5 U.S.C. § 551 et seq. (1970), around this difference in agency functions, but also the Supreme Court has repeatedly emphasized that there is

> a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other. United States v. Florida East Coast Ry. Co., 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973).

**26.** The distinction between legislative facts and adjudicative facts has been well summarized by Professor Davis:

> Adjudicative facts are the facts about the parties and their activities, businesses, and properties. Adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law and policy and discretion. 1 Davis, Administrative Law Treatise § 7.02 at 413 (1958).

**27.** 12 C.F.R. § 225.4.

**28.** 12 C.F.R. § 225.4(a)(1), (3), and (5).

**29.** Regulation Y is based upon industry-wide legislative facts, general in scope and prospective in application. *See* American Airlines v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624 (1966). By promulgating a list of activities determined to be "closely related" to banking, the Board has not authorized or permitted a single bank holding company actually to engage in such activities. The individual applicant must still affirmatively show, on a case-by-case basis, that its proposal meets the "public benefits" test of section 4(c)(8). See text accompanying note 30 *infra.*

though it may determine that it is closely related to banking.[30]

Resolution of the "public benefits" question, as far as our research shows, has never been accomplished by regulation. Each applicant has been required to meet this test on an individual basis. It could hardly be otherwise, given the impossibility of deciding as a general rule, without reference to the particular geographic location and economic market of the applicant, whether, as section 4(c)(8) requires,

> [the approval of a particular holding company's application] can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices.[31]

In the final analysis, these are questions of "adjudicative fact," which depend on the particular characteristics and situation of the applicant.

Recently, in American Bancorporation, Inc., et al. v. Board of Governors of Federal Reserve System,[32] the Eighth Circuit was confronted directly with the question whether challengers of a holding company application under section 4(c)(8) were entitled to a trial-type hearing in which to raise adjudicative issues whose "resolution [was] crucial to a determination of whether the public benefits reasonably to be expected from the acquisi-

tion override any possible adverse effects . . . .."[33] The court found the questions of " 'how, why [and] with what motive or intent' " the holding company in that case intended to manage its proposed subsidiary to be

> intrinsically the kind of [issues of] facts that ordinarily ought not to be determined without giving the parties a chance to know and meet any evidence that may be unfavorable to them, that is, without providing the parties an opportunity for trial.[34]

The court remanded the case to the Board, therefore, with instructions to conduct a trial-type hearing, under its Rules of Practice for Formal Hearings,[35] on those issues.[36]

The Eighth Circuit's ruling is in accord with the view expressed by this court in National Association of Insurance Agents, Inc. v. Board of Governors of the Federal Reserve System.[37] There we found premature the petitioner's request for review of an interpretative rule issued by the Board with respect to Regulation Y. Our finding was based in large part on

> petitioner's ability to oppose, in *the hearings required to be held* before any bank holding company can be permitted to engage in insurance activities, particular applications of the 1971 regulation with the gloss of the 1972 rule, and *the clear contemplation of the Act that Board adjudication based*

---

**30.** H.R.Rep.No.1747, 91st Cong., 2d Sess. 15 (1970), 1970 U.S.Code Cong. & Admin.News, p. 5572 (emphasis added).

**31.** 12 U.S.C. § 1843(c)(8).

**32.** 8 Cir., 509 F.2d 29 (1974).

**33.** *Id.* at 39.

**34.** *Id.* at 38, *quoting* 1 Davis, Administrative Law Treatise § 7.02 at 413 (1958).

**35.** 12 C.F.R. § 263.

**36.** BankAmerica Corporation v. Board of Governors of the Federal Reserve System, 491 F.2d 985 (9th Cir. 1974), is not to be contrary. There BankAmerica Corporation demanded a hearing on its application to engage in an activity which the Board had already determined, after rulemaking (in which BankAmerica had

participated), was to be *excluded* from Regulation Y. The Ninth Circuit upheld the Board's denial of a hearing.

The correctness of the Ninth Circuit's decision is supported by solid Supreme Court precedent holding that, notwithstanding a statutory hearing requirement, an agency retains the power to promulgate rules of general application and deny an adjudicatory hearing to applicants whose proposals on their face show violations of the rule. *See* United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956), and FPC v. Texaco, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964). This is not such a case.

**37.** 160 U.S.App.D.C. 144, 489 F.2d 1268 (1974).

*upon an adversary hearing record is the only available avenue to such permission . . ..*[38]

 In sum, when the Board acts by order, as it must in judging the merit of individual applications where adjudicative facts are in dispute, it is required to accord a full hearing to interested parties who present a material factual contest to such applications.

Still further support for this position is found in the language of section 9 of the Act. That section provides that in judicial review of Board *orders* "[t]he findings of the Board as to the facts, *if supported by substantial evidence*, shall be conclusive."[39] This standard of review is identical to that provided in section 706(2)(E) of the Administrative Procedure Act for formal hearings under sections 556 and 557 of the APA.[40] In Mobil Oil Corporation v. Federal Power Commission,[41] this court explored at length the question of the significance of the "substantial evidence" requirement. We concluded there that at a minimum this standard necessitated "adversary, adjudicative-type procedures"[42]—even though the proceedings in that case combined elements of legislative policy determination with adjudicative resolution of disputed facts.

 In the instant case, we are presented with a proceeding which is, or should be, almost entirely adjudicative in character. It focuses on the factual and legal merit of a single application by one holding company to engage in a specified activity. Under the "public benefits" test, the Board cannot approve the application without examining both the indi-vidual character of the holding company and the particular economic effects of its proposal. In view of the essentially adjudicative nature of this determination, the presence of the "substantial evidence" test here underscores and validates our position that the Board must proceed under its Rules of Practice for Formal Hearings.[43]

### C. The Omission of an "On the Record" Clause

The Board's final statutory argument is based on the omission from the new section 4(c)(8) of a clause requiring that Board determinations be made "on the record." The agency relies heavily on the decision of the Supreme Court in United States v. Florida East Coast Railway Company,[44] where the Court distinguished between statutes requiring an agency to act "after hearing" and statutes providing for decisions based "on the record after opportunity for an agency hearing." The latter language is that used in sections 553(c) and 554(a) of the APA to identify formal proceedings which must be conducted in accordance with the provisions of sections 556 and 557. The Court held that the words "after hearing," without more, would not automatically trigger the applicability of the APA's formal hearing provisions.[45] *Ipso facto,* the Board argues here, "when a statute contains no 'on the record' requirement, the informal rule-making requirements of 5 U.S.C. 553 apply and the provision for a hearing may be satisfied by evidentiary submission in written form only."[46]

 This argument is faulty in several respects. The Supreme Court in *Flor-*

---

**38.** *Id.* at 163, 489 F.2d at 1271 (emphasis added).

**39.** 12 U.S.C. § 1848.

**40.** The reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; . . .
5 U.S.C. § 706.

**41.** 157 U.S.App.D.C. 235, 483 F.2d 1238 (1973).

**42.** *Id.* at 256, 483 F.2d at 1259.

**43.** These rules provide that hearings must be conducted in accordance with the provisions of the APA. 12 C.F.R. § 263.6(b). That is, the hearings must conform to 5 U.S.C. § 556, which requires, *inter alia*, testimony under oath and cross-examination of witnesses.

**44.** 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

**45.** *Id.* at 237–38, 93 S.Ct. 810.

**46.** Govt.Br. at 30.

*ida Railway* did not hold that in the absence of "on the record" language, an agency could always utilize informal rule-making procedures. The bulk of the Court's opinion makes quite clear that its interpretation of "hearing" in section 1(14)(a) of the Interstate Commerce Act depended primarily upon the statutory context of the term and its particular legislative history.[47] As to the statutory role of this "hearing," the Court found its purpose to be primarily legislative, rather than adjudicative, in nature:

> [T]hese decisions represent a recognized distinction in administrative law between proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other.
>
> Here, the incentive payments proposed by the Commission in its tentative order, and later adopted in its final order, were applicable across the board to all of the common carriers by railroad subject to the Interstate Commerce Act. No effort was made to single out any particular railroad for special consideration based on its own peculiar circumstances. . . . Though the Commission obviously relied on factual inferences as a basis for its order, the source of these factual inferences was apparent to anyone who read the order of December 1969. *The factual inferences were used in the formulation of a basically legislative-type judgment, for prospective application only, rather than adjudicating a particular set of disputed facts.*[48]

In sum, due to the essentially legislative nature of the determination, the Court concluded informal rulemaking procedures would satisfy the "hearing" requirement of section 1(14)(a).

In the instant case, by contrast, the Board's determination as to the balance of "public benefits" and "adverse effects" which inhere in a particular application is essentially adjudicative in character. The Board has a quasi-judicial function here which can be properly implemented only through the use of trial-type procedures. That the Board's decision is subject to the "substantial evidence" standard of judicial review—which "has customarily been directed to adjudicatory proceedings or formal rulemaking"[49]—buttresses this position. Perhaps even more important evidence, however, of the significant difference between the phrase "opportunity for hearing" in section 4(c)(8) of the Bank Holding Company Act and the phrase "after hearing" in section 1(14)(a) of the Interstate Commerce Act was the Supreme Court's inability in *Florida Railway* to find "any legislative history that would shed light on the intended meaning of the words 'after hearing.' "[50] This is in sharp contrast to the wealth of legislative history surrounding section 4(c)(8) which indicates that the requirement of an "opportunity for hearing" before an individual holding company application is approved means the opportunity for a full adjudicatory inquiry.

As was detailed in Part IIA above, there was no question before 1970 that the term "hearing" in old section 4(c)(8) meant a proceeding before a hearing examiner under the Board's Rules for Practice for Formal Hearings. This proved wasteful of the Board's resources in many cases, because often there was no contest to a holding company application. The Chairman of the Board asked Congress to change the statute in order to limit this "time-consuming and expensive procedure" "to instances where a hearing is requested by an interested party."[51] In a precise response to the

---

**47.** 410 U.S. at 238–46, 93 S.Ct. 810.

**48.** *Id.* at 245–46, 93 S.Ct. at 821 (emphasis added).

**49.** Industrial Union Dept., AFL–CIO v. Hodgson, 162 U.S.App.D.C. 331, 337, 499 F.2d 467, 473 (1974).

**50.** 410 U.S. at 239, 93 S.Ct. at 818.

**51.** Hearings on H.R. 6778 Before the House Comm. on Banking and Currency, 91st Cong., 1st Sess., pt. 1, at 199 (1969).

Chairman's recommendation, Congress replaced "hearing" with "opportunity for hearing," "so that the Board would not be required to hold hearings in all cases involving Section 4(c)(8) applications, but should hold hearings in all cases where a contest is raised." [52] The meaning of the term "hearing" in section 4(c)(8) had not changed one whit. The only difference was that a formal inquiry would not be held automatically; rather, it had to be invoked, as in the instant case, by an interested party.

The question might still be raised why, if Congress intended hearings on individual applications under section 4(c)(8) to be adjudicatory in nature, the phrase "on the basis of the record made at such hearing" was omitted. There are two simple explanations for this omission. The first is that if no contest is raised to a particular holding company application, under the new statute there need be no formal hearing. A *fortiori*, the Board's decision in these cases need not be made on the basis of the record made at such hearing. Thus, there would have been an internal inconsistency in the statute had the clause not been removed.

Second, the new statute recognizes the Board's ability to set forth, by regulation, general guidelines for applicants under section 4(c)(8). Presumably, these guidelines can be determined in informal rulemaking proceedings pursuant to section 553 of the APA.[53] In short, the Board's decision to promulgate a regulation does not have to be made on the basis of a record made in a formal hearing. Deletion of the "on the record" clause was necessary to avoid imposing the same procedural requirements on the Board's rulemaking proceedings as were required for its adjudicatory proceedings. The procedural requirements now rest on the Administrative Procedure Act and

its relationship to the substantive statute involved, under well-recognized criteria.[54]

In the entire legislative history of the 1970 amendments to section 4(c)(8) there is not a single reference to omission of the "on the record" clause. Congress' sole concern appears to have been the addition of the phrases "opportunity for hearing" and "(by order or regulation)." The only logical explanation for this failure to comment on the deletion is that Congress considered the deletion unimportant in itself. Removal of the "on the record" language, therefore, was accomplished for the simple purpose of avoiding the textual conflicts described above, and not to signify that *all* Board decisions under section 4(c)(8) could be made by informal rulemaking procedures.

In sum, the language, function, and legislative history of the hearing requirement in section 4(c)(8) dictate the conclusion that in passing upon individual applications the Board, if it receives a petition challenging the factual underpinnings of an application, must employ formal adjudicatory procedures.

### III. The Utility of an Adjudicatory Hearing

Assuming *arguendo* that section 4(c)(8) provides for an evidentiary hearing, the Board takes the position that the statute should be interpreted to require such only if the party requesting the hearing raises issues which are amenable to resolution in an adjudicatory setting, and that no such issues were raised here.[55] In its letter of 26 June 1973 denying the protestants' petition for a formal hearing, the Board gave as its sole justification the parties' failure to "raise any dispute as to relevant material facts." [56] Reasoning that legislative policy determinations, rather than adjudicative

---

**52.** H.R.Rep.No.1747, 91st Cong., 2d Sess. 15 (1970), 1970 U.S.Code Cong. & Admin.News, p. 5566.

**53.** 5 U.S.C. § 553.

**54.** *See* United States v. Florida East Coast Ry. Co., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).

**55.** Govt.Br. at 32–35.

**56.** R. 389.

facts, were at issue, the Board concluded an evidentiary hearing was not required.

 The case law in this Circuit is clear that an agency is not required to conduct an evidentiary hearing when it can serve absolutely no purpose. In such a circumstance, denial of a hearing may be proper even though adjudicatory pro-

ceedings are provided for by statute. The agency, however, carries a heavy burden of justification. Where Congress has plainly given interested parties the right to a full hearing, the agency must show that the parties could gain nothing thereby, because they disputed none of the material facts upon which the agency's decision could rest.[57]

**57.** The Government cites five cases from this Circuit for the proposition that an agency is not required to conduct a hearing if no material facts are in dispute: American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624 (1966); Anti-Defamation League of B'nai B'rith v. FCC, 131 U.S.App.D.C. 146, 403 F.2d 169 (1968); Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 414 F.2d 1125 (1969); Pennsylvania Gas & Water Co. v. FPC, 150 U.S.App.D.C. 151, 463 F.2d 1242 (1972); and Citizens Committee to Keep Progressive Rock v. FCC, 156 U.S.App.D.C. 16, 478 F.2d 926 (1973).

Three of these cases are not on point here. *American Airlines* dealt with rulemaking proceedings by the CAB involving the entire airline industry. It was not because no facts were in issue, but because they were "legislative" in character, that no adjudicatory hearing was required. *Pennsylvania Gas* is inapposite because there was no statutory right to a hearing in that case. And in the *Progressive Rock* case this court *granted* a hearing, after finding that the appellant had met a *statutory* requirement that "substantial and material questions of fact" be raised.

The two remaining cases, *Anti-Defamation League* and *Allegan County*, support the statement in text. It is important, however, to emphasize the narrowness of the holding in each case. The fact pattern of the incidents in question in *Anti-Defamation League* was very simple. All parties were in agreement as to exactly what had happened. "The disposition of Appellant's claims turned not on determination of facts but on inferences to be drawn from facts already known and legal conclusions to be derived from those facts." 131 U.S.App.D.C. at 148, 403 F.2d at 171. In sum, nothing could have been gained from an evidentiary hearing.

*Allegan County* involved a more complex fact situation. The Federal Power Commission was required to determine that a city's sale of its electric system was in the public interest. This court upheld the Commission's denial of a hearing on that question to an interested citizens' group. However, not only had the Commission refuted in detail each of the group's factual allegations, but both the city council and the citizenry—through a special referendum—had made a decision that it was in their interest to sell the city's electric

system. Emphasizing that "[a] greater duty of inquiry in depth may be applicable in a case where the Commission was the sole official guardian of the public interest," 134 U.S.App. D.C. at 234, 414 F.2d at 1130, the court affirmed "in the particular case . . ., not without some hesitancy, because the unique setting includes a political decision made by the City coupled with the weakness of the Citizens' allegations." *Id.* at 233, 414 F.2d at 1129.

These cases, then, made clear that denial of a statutorily mandated hearing is justified only in exceptional circumstances. A petitioner need not make detailed factual allegations in order to meet the requirement that he raise "issues of material fact." He need only show that an "inquiry in depth" is appropriate. As Subparts IIIA and B, *infra*, make clear, that showing has been amply made in the instant case.

This court's discussion in *Allegan County* of the importance of not cutting off the right to adjudicatory procedures is precisely applicable here:

An analogy is sometimes drawn from the court rules which provide summary judgment procedure for the cases that involve only legal issues and no bona fide disputed questions of fact, where it is quite clear what the truth is and there is really no issue to try.

This analogy calls to mind, however, that even in court litigation there are limitations on use of summary procedure, limitations that may usefully delineate, and restrict, the appropriate use of abbreviated procedures by administrative agencies required to act after opportunity for hearing.

For example summary procedures are held to have only limited scope in antitrust litigation. When that approach was first put forward, reference was made to the inappropriateness of summary procedures for an area of law "where motive and intent play leading roles." The same principle was also applied, however, to an area not turning on intent when the Court, faced with a novel legal issue, decided it was inappropriate "to reach a conclusion on the bare bones of the documentary evidence," and determined to consider its disposition in the light of a trial developing more information as to the actual impact on competition of the arrangements . under attack. [Cite] Similar considerations

In the instant case, as was discussed in Part II, *supra,* the language of the hearing provision in section 4(c)(8), its legislative history, and the nature of the statutory scheme provide solid proof of Congress' intent that protestants of a holding company application should receive a formal hearing "in all cases where a contest is raised."[58] Indeed, so convinced was Congress of the importance of affording affected parties an opportunity to challenge such applications that it amended the standing provision of the Act expressly to ensure that a competitor of an applicant's proposed subsidiary should have the right to be a party in interest in proceedings before the Board.[59] With regard to this 1970 amendment, the Conference Report explained:

> [T]he broadest possible forum should be allowed for adversary proceedings to take place in order that all issues may be aired completely.[60]

The Board's burden before this court is to show that, because there was no dispute as to material facts, it would have been futile to follow Congress' mandate.

Under section 4(c)(8) the Board must make two determinations: (1) whether the activity in which the applicant proposes to engage is "closely related" to banking; and (2) whether the "public benefits" of the particular proposal advanced by the applicant can reasonably be expected to outweigh its adverse effects. As was noted earlier, the Board has determined by general regulation that the activities in which C & S Holding intends to engage are "closely related" to banking. The Association does not dispute this finding. The Association's concern is, rather, to show that C & S's proposal does not meet the "public benefits" test. Since resolution of this question depends upon the character of the individual applicant and the particular economic impact of his proposal, the Board had understandably left this determination for resolution on a case-by-case basis.

The statute itself cites "greater convenience, increased competition, or gains in efficiency" as examples of positive factors the Board should consider in balancing the merits of a proposal.[61] Suggested negative factors are "undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices."[62] The Association in both its original Petition for Hearing and its Amended Petition for Hearing contended, *inter alia,* that the C & S Holding proposal would constitute undue concentration, lead to decreased competition, and violate state branch banking law. The Board argues, first, that "[t]hese issues are not the kind that an adjudicatory hearing could help re-

---

may be pertinent when an agency is considering approval of a merger or *other issues of consolidation of control.* These and other questions of public interest confronting an administrative agency will often be illuminated by an exploration in greater depth than can be provided simply by pleadings and documents.

134 U.S.App.D.C. at 232–33, 414 F.2d at 1128–29 (footnotes omitted).

**58.** H.R.Rep.No.1747, 91st Cong., 2d Sess. 15 (1970), 1970 U.S.Code Cong. & Admin.News, p. 5566.

**59.** 12 U.S.C. § 1850 (1970):

With respect to any proceeding before the Federal Reserve Board wherein an applicant seeks authority . . . to engage directly or indirectly in a nonbanking activity pursuant to section 1843 of this title, . . . a party who would become a competitor of the applicant or subsidiary thereof by virtue of the applicant's or its subsidiary's acquisition, entry into the business involved, or activity, shall have the right to be a party in interest in the proceeding and, in the event of an adverse order of the Board, shall have the right as an aggrieved party to obtain judicial review thereof as provided in section 1848 of this title or as otherwise provided by law.

**60.** H.R.Rep.No.1747, 91st Cong., 2d Sess. 15 (1970), 1970 U.S.Code Cong. & Admin.News, p. 5581.

**61.** 12 U.S.C. § 1843(c)(8).

**62.** *Ibid.*

solve." [63] Rather, according to the Board, they are issues of law or policy " 'involving expert opinions and forecasts which cannot be decisively resolved by testimony.' " [64]

No one disputes that the decision of the Board on the branch banking issue depends ultimately upon the dictates of Georgia and federal law. Similarly, it is clear to all parties that the question whether approval of the C & S Holding proposal will lead to decreased competition or undue concentration of resources can only be answered, in the final analysis, by expert prediction based upon past experience. That these determinations rest upon the application of generalized principles to the C & S proposal, however, by no means justifies avoiding procedures whose purpose it is to discover exactly what the specific facts of this particular proposal are. All adjudication requires the application of "law" to facts. Nevertheless, as a rule a party in interest may not be deprived of his right to have the facts aired and tested in adversary proceedings—unless it is shown that *none* of the facts material to the ultimate decision are in dispute.

This is the Board's second argument, and its primary contention, that the Association raised no dispute as to material facts. In reality, however, the Association contested two major assumptions about C & S Mortgage's proposed operation that were basic to the Board's decision to approve the application.

## A. *The Branch Banking Question*

First, the Association argued that the C & S Holding proposal to establish mortgage company offices in eleven Georgia cities would constitute branch banking by C & S National, because of the essentially unitary operation of the C & S system. Since some offices of C & S Mortgage would be located in counties in Georgia where C & S National is not presently authorized to have offices, the Association contended that C & S Holding's proposal would violate the provision of the Georgia Code which restricts bank branching to those counties where the bank is already authorized to operate.[65] Under section 36(c) of Title 12 of the United States Code, a national bank is subject to the same branching restrictions as are imposed on similarly situated state banks.[66] The Board, therefore, must deny a holding company application which would transgress state law.

Although state law governs where, how, and when a national bank can branch, federal law determines what is a branch.[67] It is clear under section 36(f) of Title 12 that if C & S National itself opened mortgage offices, such an operation would constitute "branch banking." [68] The critical question here is

63. Govt.Br. at 33.

64. *Ibid., quoting* American Airlines v. CAB, 123 U.S.App.D.C. 310, 319, 359 F.2d 624, 633, cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).

65. R. 4, 222–34.

66. 12 U.S.C. § 36(c):
 A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: . . . (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question . . ., and subject to the restrictions as to location imposed by the law of the State on State banks.

67. First National Bank v. Dickinson, 396 U.S. 122, 133, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969).

68. As defined by 12 U.S.C. § 36(f):
 The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business . . . at which deposits are received, or checks paid, or *money lent*.
 The language of § 36(f) is in the disjunctive; therefore, a branch exists if any of the three activities mentioned are engaged in by a national bank. *See* First National Bank v. Dickinson, 396 U.S. 122, 135, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969). It is clear that the proposed C & S Mortgage offices will be engaged in a type of activity embraced by § 36(f)—*i. e.*, lending money. R. 4.

whether the interposition of C & S Holding and C & S Mortgage dictates a different result. There is a strong authority for the proposition that substance prevails over form in this area. In First National Bank v. First Bank Stock Corporation,[69] the Ninth Circuit set forth the standard to be met in order to establish that a bank holding company and its affiliate or affiliates are operating as a single system. It must be shown that "in substance" a bank "is doing business through the instrumentality of" the affiliate institution which constitutes the alleged branch, "or vice versa, in the same way as if the institutions were one."[70] The court observed:

> We do not agree with appellees that the fact that the two banks are separate corporate organizations demonstrates conclusively that one is not a branch of the other. In the banking field, as elsewhere, courts have power to "pierce the corporate veil" when the realities require it.[71]

The Ninth Circuit's position was adopted by this court in Whitney National Bank v. Bank of New Orleans.[72] We found branch banking there in the face of a corporate reorganization carefully designed to avoid Louisiana law: "The nature of the arrangement, and not the label applied to it, determines the character of the relationship between two banking institutions."[73] The federal law regarding branch banking was enacted for the purpose of preserving the competitive equality between state and national banks.[74] The unitary operation theory underlying "piercing the corporate veil" is to enable a determination to be made as to whether a national bank is attempting to gain a competitive advantage over state banks by establishing additional places of business, without having to comply with the restrictions of the state branch banking laws.

That C & S National in reality might well control the activities of C & S Mortgage is evidenced by the fact that C & S Holding is wholly owned by C & S National and C & S Mortgage in turn is wholly owned by C & S Holding. By virtue of its ability to control both the election of directors of C & S Mortgage indirectly through C & S Holding and the outcome of votes on all matter requiring shareholder approval, C & S National could effectively manage C & S Mortgage. Particularly in view of the facts that C & S Mortgage will be financed by C & S Holding, a substantial amount of the mortgage lending activities presently engaged in by C & S National will be shifted to C & S Mortgage, and the principal management positions of the staff of C & S Mortgage will be filled by persons formerly employed in the Real Estate Finance Department of C & S National, there is a strong facial possibility of a "unitary operation."

The Association's initial Petition for Hearing did not simply allege that the C & S Holding proposal would involve illegal branch banking. It requested a formal hearing

> in order to provide a full opportunity for the Petitioners, particularly the various banks who are members of the Petitioner Association who would be adversely affected if the present application is approved, *to develop all of the facts bearing upon the reasons listed above for the necessity of a hear-*

---

**69.** 306 F.2d 937 (9th Cir. 1962).

**70.** *Id.* at 942.

**71.** *Ibid.*

**72.** 116 U.S.App.D.C. 285, 323 F.2d 290 (1963), rev'd on other grounds, 397 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965). The court stated:
> We agree with the Ninth Circuit that the corporate veil should be pierced whenever one bank is "doing business through the instrumentality of" the other or "in the same way as if the institutions were one." . . In such circumstances, the relation of parent and branch exists, even though the banks are separate corporate organizations. *Id.* at 298, 323 F.2d at 303.

**73.** *Id.* at 296, 323 F.2d at 301.

**74.** First National Bank v. Dickinson, 396 U.S. 122, 131, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969); First National Bank v. Camp, 151 U.S.App. D.C. 1, 10–11, 465 F.2d 586, 596–97 (1972).

*ing, including prehearing discovery procedures,* so that the Board will be fully informed and in a better position to make a determination on the present application and upon the threshold legal questions raised herein, *and that Petitioners may have a complete record for court review,* if that is indicated.[75]

Obviously, the question of the likelihood that C & S National would control C & S Mortgage in violation of Georgia law depended, not simply upon the formal structure of the C & S system, but also upon myriad details of its day-to-day operations and the alleged proclivity C & S National had shown in the past for using puppet corporations to avoid branching laws. The purpose of the Association's request for a hearing was to get at those details through discovery, to examine the officials of C & S National and C & S Holding under oath as to the relationship between C & S National and C & S Mortgage, and to test the credibility of C & S National's representations through cross-examination. In sum, the Association disputed a fact which was essential to the Board's decision, *viz.,* C & S National's intent in combining with C & S Holding to set up C & S Mortgage. This is the kind of factual determination which is best suited to the give-and-take of adversary proceedings.

 As the Eighth Circuit recognized in American Bancorporation, Inc., et al. v. Board of Governors of Federal Reserve System,[76] the question of the intent of the applicant under section 4(c)(8) is essentially an adjudicative issue:

> The record reflects that the petitioners conceded Banco and Evensen to be ethical businesses, but this concession scarcely serves as any substitute for concrete evidence, obtained by testimony under oath, and cross-examination,

of the manner in which Banco intended to operate, control, and benefit from its proposed subsidiary.[77]

The Association in the case at bar sought the same advantages of a formal hearing.

The Board nevertheless treated C & S Holding's skeletal representations as to their intended operation as determinative of its legality:

> C & S Holding represents that C & S Mortgage will have a separate staff, separate Board of Directors, separate offices and separate capital structure from C & S National; and C & S Mortgage will be financed initially by investment of equity capital and loans from C & S Holding; that if, to meet lenders' requirements C & S Mortgage originates any loans for C & S National, the latter will be treated like any other customer-lender and charged the usual fee for services rendered. The evidence does not justify a conclusion that C & S Mortgage is being established to avoid branch banking restrictions or that the proposed operation is planned to be the "unitary" type indicative of branch banking.[78]

 That the Association desired discovery rights and an adversary proceeding in which to test the substance of C & S Holding's avowals is certainly not surprising, particularly in view of the C & S system's allegedly questionable record of expansion in the past. Georgia law provides that it shall be unlawful "for any bank holding company to acquire or hold direct or indirect ownership or control of more than five per cent. of the voting shares of any bank."[79] The purpose of the law is to preserve the independence of such banks from the holding company. C & S Holding owns 5% of the stock of twenty-seven banks in Georgia. In 1971 the Association brought an action in

---

**75.** R. 171–72 (emphasis added).

**76.** 8 Cir., 509 F.2d 29 (1974).

**77.** *Id.* at 38.

**78.** Order of 31 August 1973. R. 431–32.

**79.** Ga.Code Ann. § 13–207(a)(2).

Georgia state court against C & S National and C & S Holding charging that C & S National (through C & S Holding) controlled more than 5% of the voting shares in ten different "five-percent" banks. C & S National argued in its defense that it exercised neither direct nor indirect control over those banks.[80]

In the same year, however, pursuant to a newly-passed amendment to the Georgia branch banking laws which permits banks to establish branches throughout the counties in which they are located, C & S National sought permission from the Federal Deposit Insurance Corporation to merge six of its "five-percent" banks with two of its subsidiaries. The FDIC approved a number of the mergers. The Antitrust Division of the Department of Justice thereupon filed suit in federal district court in Georgia against C & S National and C & S Holding, among others, seeking to enjoin the proposed mergers in order to prevent violations of section 7 of the Clayton Act.[81] In response to the charge that the proposed mergers would substantially lessen competition, C & S National argued:

> In summary, the record demonstrates without doubt that *the defendant banks represent, in effect, a single economic enterprise.* The plaintiff has been unable to present any evidence to

offset the joint identification shared by the defendant banks or to refute the testimony showing that *C & S National exercises a controlling influence over the management and policies of each C & S 5% bank. . . .* In short, it is clear that *this lawsuit does not involve independent banks* that have been, are, or may be in competition with each other. Instead, the evidence demonstrates that the defendant 5% banks have been C & S banks since their organization and have been and are providing C & S banking services to the communities in which they are located.[82]

This position was not only directly contrary to the defense C & S National had raised in the state case, which it lost,[83] but amounted to an admission that the six C & S 5% banks sought to be merged had been operated as branch banks of C & S National in areas where C & S National had previously been restricted from branching by Georgia law.[84]

In view of C & S National's recent record vis-a-vis state laws designed to limit the expansion of bank holding companies, the Association certainly has cause to question its motives with regard to C & S Mortgage. Having raised a dispute as to this critical factual issue, the Association was entitled to explore it in adversary proceedings.

---

80. *See* Independent Bankers Ass'n of Georgia v. Dunn, 230 Ga. 345, 197 S.E.2d 129 (1973).

81. United States v. The Citizens and Southern National Bank, 372 F.Supp. 616 (N.D.Ga.1974).

82. R. 430 (emphasis added).

83. The Supreme Court of Georgia found:

> The officers and directors are the alter egos of the bank. It is clear under the evidence here that they are doing indirectly that which cannot be done directly. The independence of these ten five per cent defendant banks, which the banking Act seeks to preserve, is lost.

197 S.E.2d at 139. The court held, therefore, that the trial court was in error by not issuing a mandamus to compel the Georgia Commissioner of Banking and Finance to take action

against C & S National and C & S Holding to enforce the Georgia Bank Holding Company Act. Subsequently, the Commissioner notified C & S that he considered the rationale of the Georgia Supreme Court's decision to be applicable to *all* of C & S's "five per cent" banks (approximately 27 in number). C & S accepted this conclusion of the Commissioner. R. 432.

84. The District Court for the Northern District of Georgia found convincing C & S National's argument that the mergers it proposed would not be in violation of § 7 of the Clayton Act, because C & S National had long controlled the "five per cent" banks in question. Thus, the mergers would result in no lessening of competition. 372 F.Supp. at 628–43. On appeal, the Supreme Court affirmed the District Court's judgment. —— U.S. ——, 95 S.Ct. 2099, 45 L.Ed.2d 41.

B. *The Question of Decreased Competition and Undue Concentration of Resources*

█ In its Petition for Hearing, the Association argued:

> If the pending application is approved, C & S National Bank and C & S Holding Company will gain substantially increased power in the financial market in Georgia and will add to the already "undue concentration of resources" in their control, contrary to Section 4(c)(8) of the BHC Act.[85]

As with the branch banking question, the Association requested a formal hearing on the questions of undue concentration and decreased competition not so much to *present* facts as to *discover* them. Much of the data the Association would need to substantiate its claim could only be obtained by access to C & S records and cross-examination of C & S officials. The questions, for example, of C & S National's dominance of the Georgia financial world, the degree to which it had employed *sub rosa* branching tactics in the past, and the techniques by which it may have exerted control over the holding company and its affiliates are all archetypally factual in character. Clearly, such information would be material to the Board's decision on the questions of "undue concentration" and "decreased competition." [86]

█ The fact that the Board was already in the possession of some facts about C & S's financial position in Georgia does not justify denying the Association the opportunity to uncover additional information. The question of "public benefits," like the more common administrative standard of "public convenience and necessity," can be answered only by weighing *all* the facts. Some may be more important than others, but this relative determination can only be made after all the data is assembled. Particularly in view of Congress' intent that opponents of a section 4(c)(8) application should have the advantage of adversary proceedings "in order that all issues may be aired completely," [87] the Board erred in not honoring the Association's request for a hearing in which to develop its charges of "undue concentration" and "decreased competition."

IV. *The Timing of the Association's Request for a Hearing*

█ The Board's final argument is that the Association waived its procedural rights under section 4(c)(8) by not requesting a hearing initially from the local Federal Reserve Bank, but instead delaying its request until the C & S Holding proposal came before the Board.

The primary difficulty with this argument is that neither the statute nor the Board's regulations provide for the initiation or conduct of formal hearings by a local Reserve Bank. Section 4(c)(8) itself refers only to determinations by the Board. The Board's general Rules of Practice for Formal Hearings state:

> This subpart prescribes rules of practice and procedure followed by the *Board* with respect to adjudication as to which a hearing is required by law or is for other reason ordered by the Board. Among such adjudications are those relating to: . . . applications pursuant to sections 3 and 4 of the Bank Holding Company Act of 1956 (12 U.S.C. 1842, 1843) . . . . [88]

The specific regulations dealing with applications for *de novo* operations under

---

**85.** R. 170.

**86.** Of course, the fact that C & S Holding proposes to engage *de novo* in mortgage banking, rather than by acquisition of a going concern, is also a factor to be considered. Section 4(c)(8) explicitly mentions this as a differentiating, presumably pro-competitive, element. Nevertheless, this competitive factor is certainly subject to contradiction by evidence, for example, that the C & S proposal has a monopolistic purpose, or that it will decrease competition despite its *de novo* characteristics.

**87.** H.R.Rep.No.1747, 91st Cong., 2d Sess. 30 (1970), 1970 U.S.Code Cong. & Admin.News, p. 5581.

**88.** 12 C.F.R. § 263.1 (emphasis added).

section 4(c)(8) provide only that protestants submit "adverse comments" to the Reserve Bank within thirty days after a company has published its proposal.[89] The Association submitted its comments in a timely fashion and was notified that the Reserve Bank had stayed approval of the C & S Holding proposal pending further evaluation. The Association was given an opportunity to submit further comments, but was not advised of any right to a hearing before the Reserve Bank. Under these circumstances, it is impossible to accept the Board's argument that the Association waived its right to a hearing before the Board because it did not request a hearing before the Reserve Bank.

Our holding as to the timeliness of the Association's Petition for Hearing is reinforced by the fact that the Board itself did not deny that petition until almost ten months after it was filed. Moreover, the denial was not based, either in whole or in part, upon the timing of the petition. It would appear, then, that the Board's concern was certainly not with the Association's "delay" in requesting a hearing, but only with the merit of that request.

## V. *Conclusion*

In view of our holding that the Board erred in denying the Association a formal hearing in which to explore the substantive issues of the compliance of the C & S Holding proposal with Georgia branch banking laws and with the "public benefits" requirement of section 4(c)(8), it would be premature for this court to pass upon those questions. Their resolution necessarily turns on facts yet to be adduced. Accordingly, we remand to the Board with instructions to conduct a hearing in this case pursuant to its Rules of Practice for Formal Hearings.

So ordered.

ROBB, Circuit Judge (concurring):

I concur in the result. To avoid any misunderstanding of my concurrence I add a few words.

In my opinion subsection 4(c)(8) of the Bank Holding Company Act, 12 U.S.C. § 1843(c)(8), does not require a formal hearing in every case in which one is requested by an interested party. I think a hearing is required only when material facts are in dispute. Moreover I believe that a mere allegation of material facts in dispute is not enough to make a hearing necessary; the allegation must have some support in the record.

As the majority seems to recognize, the purpose of the 1970 amendment was to eliminate the necessity for a hearing on every application under the section, even in the absence of any contest. This being so I cannot believe that Congress intended to require an adjudicatory hearing in a case where the facts are not in dispute and the only issue is one of law. In such a case there is no contest on the facts and a hearing on factual issues would be useless. And if the facts are undisputed a mere request for a hearing cannot create a "contest" requiring a hearing. In other words I think section 4(c)(8) should not be construed to require a hearing "that will be empty sound and show, signifying nothing." Citizens for Allegan County, Inc. v. FPC, 134 U.S. App.D.C. 229, 232, 414 F.2d 1125, 1128 (1969). The distinction I have in mind is well illustrated by American Bancorporation, Inc. v. Board of Governors of Federal Reserve System, 509 F.2d 29 (8th Cir. 1974), cited by the majority. In that case the Board, against the recommendation of the Federal Reserve Bank of Minneapolis, gave permission to an applicant to take over a corporation engaged in providing financial advice, primarily in bonding matters, to state and local governments. The Board made its decision without the benefit of an evidentiary hearing in spite of the existence of

---

**89.** 12 C.F.R. § 225.4(b)(1).

several unresolved factual issues, including the substantial question whether the applicant bank's interest in maximizing investment in it by governments would conflict with its duty in operating the corporation to provide sound advice to its government clients. On review of the Board's action, the court held:

*We do not suggest by this opinion that any list of unanswered factual issues will unlock the door to a trial-type hearing.* Congress by the 1970 amendment to the Bank Holding Company Act intended to reduce the volume of formal hearings in a burgeoning field in an effort not to overtax the supervisory capabilities of the Board. Informal supervision has characterized regulation in the banking industry and should be encouraged. In *this* case, however, the acquisition of Evensen by Banco would move bank holding companies into an uncharted field, and the public interest will best be served by exposing all of its implications and potential conflicts to an adversary examination.

509 F.2d at 39 [emphasis added, citations omitted].

In this case the Board denied the petitioner's request for a hearing upon the ground that the issues raised by the objections "were such that a hearing thereon would serve no useful purpose." 38 Fed.Reg. 24932 (1973); R. 431. In its brief in this court the Board again argues that the "issues are not the kind that an adjudicatory hearing could help resolve." [1] (Br., p. 33) The majority considers the argument and rejects it. The majority finds that the case presents questions of fact which the Association was entitled to explore through discovery and cross examination in an adversary hearing.

I suspect that counsel for the Association are overly optimistic about their ability to develop, by discovery and cross examination, that C & S Mortgage will operate illegally. By way of filings with the Board, C & S has already made extensive disclosure of its operations. The only other existing indication of how C & S Mortgage will be operated is the proposal submitted by C & S Holding, and that proposal is legal in all respects. Witnesses for C & S Holding and C & S National can hardly be expected to admit on cross examination that in operating C & S Mortgage they intend to deviate from legality. Whether C & S Mortgage will be a branch of C & S National under federal law seems to be a question of law that cannot be answered until C & S Mortgage comes into existence and begins to operate. Allegations that C & S National's operations have violated the Sherman Act and have been anti-competitive in violation of the Clayton Act are answered by the decision of the Supreme Court in United States v. Citizens and Southern National Bank, et al., —— U.S. ——, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975). In short, it seems likely to me that a hearing will prove to be a water haul for the Association, resulting only in a reaffirmance of the Board's position.

Notwithstanding what has been said I must acknowledge that as indicated by the majority the questions raised by the application and the opposition are in certain respects intricate and subtle. I cannot say with assurance that a hearing would fail to illuminate the correct answers to those questions. On this basis I concur in the result reached by the majority.

---

1. The Board does not argue, as the majority avers, that the Association waived its procedural rights under section 4(c)(8) by not making a timely request for a hearing. That argument is made by the intervenor C & S Holding (Br. for Intervenor C & S at 42–44).